IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| DENISH BHAVSAR, derivatively on behalf of SUNLIGHT FINANCIAL HOLDINGS INC. f/k/a SPARTAN ACQUISITION CORP. II, | |
| Plaintiff, | Civil Action No.: _____ |
| vs. | |
| MATTHEW POTERE, BARRY EDINBURG, RODNEY YODER, GEOFFREY STRONG, JAMES CROSSEN, OLIVIA WASSENAAR, WILSON HANDLER, CHRISTINE HOMMES, JOSEPH ROMEO, JAN WILSON, JOHN STICE, BRAD BERNSTEIN, EMIL HENRY, JR., JEANETTE GORGAS, TOAN HUYNH, JENNIFER D. NORDQUIST, PHILIP RYAN, KENNETH SHEA, JOSHUA SIEGEL, and SPARTAN ACQUISITION SPONSOR II LLC, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| SUNLIGHT FINANCIAL HOLDINGS INC. f/k/a SPARTAN ACQUISITION CORP. II, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Denish Bhavsar ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively

and on behalf of Nominal Defendant Sunlight Financial Holdings Inc. ("Sunlight" or the

"Company") f/k/a Spartan Acquisition Corp. II ("Spartan" or the "Company")[1], files this Verified

---

[1] "Sunlight" refers to the Company after the July 2021 Business Combination (defined below) and name change, whereas "Spartan" refers to the Company prior to the Business Combination and name change.

Shareholder Derivative Complaint against individual defendants Matthew Potere ("Potere"), Barry Edinburg ("Edinburg"), Rodney Yoder ("Yoder"), Geoffrey Strong ("Strong"), James Crossen ("Crossen"), Olivia Wassenaar ("Wassenaar"), Wilson Handler ("Handler"), Christine Hommes ("Hommes"), Joseph Romeo ("Romeo"), Jan Wilson ("Wilson"), John Stice ("Stice"), Brad Bernstein ("Bernstein"), Emil Henry, Jr. ("Henry"), Jeanette Gorgas ("Gorgas"), Toan Huynh ("Huynh"), Jennifer D. Nordquist ("Nordquist"), Philip Ryan ("Ryan"), Kenneth Shea ("Shea"), and Joshua Siegel ("Siegel") (together, the "Individual Defendants"), and Spartan Acquisition Sponsor II LLC (the "Sponsor") (collectively with Sunlight and the Individual Defendants, "Defendants") for breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Bernstein, Potere, Edinburg, and Henry (collectively, the "Legacy Sunlight Defendants") for aiding and abetting certain breaches of fiduciary duty by Defendants Strong, Crossen, Wassenaar, Handler, Hommes, Romeo, Wilson, and Stice (collectively, the "Spartan Defendants"); against the Individual Defendants for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against the Sponsor and Defendants Potere, Edinburg, Yoder, Strong, Crossen, Wassenaar, Handler, Hommes, and Romeo for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sunlight, legal filings, news reports, securities analysts' reports and advisories about the Company,

and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and officers from January 25, 2021 through September 28, 2022, both dates inclusive (the "Relevant Period"). During the Relevant Period, through August 16, 2021, Defendants made a series of false and misleading statements about the challenges Sunlight was facing with regard to its supply chain (the "False and Misleading Supply Chain Period"). Separately, but concurrently until the end of the Relevant Period, Defendants also made a series of false and misleading statements about the risks involved with Sunlight's cash advance program to its contractors (the "False and Misleading Advance Program Period").

2. Sunlight operates a business-to-business-to-consumer point-of-sale ("POS") financing platform that partners with contractors nationwide to provide homeowners with financing for the installation of residential solar systems and other home improvements. The Company is the result of a business combination that closed on July 9, 2021 (the "Business Combination") between Spartan and Sunlight Financial LLC ("Legacy Sunlight"), a private company operating as a provider of loans for the residential solar market. Upon completion of the Business Combination, the Company took on the operations of Legacy Sunlight's business as its own.

3. Sunlight does not advertise directly to homeowners, instead choosing to rely on contractors to inform customers about Sunlight's financing options. As a result, in order for the Company to generate revenue, it needs to persuade as many contractors as possible to use the Company's financing platform when signing up customers. Notably, the agreements Sunlight enters into with its contractors are not exclusive, meaning that a contractor in the Company's

network is not required to use the Company's financing platform and instead may use the platforms of any of the Company's competitors when providing financing options to customers.

4.     To distinguish itself from its competitors, Legacy Sunlight implemented a cash advance program for its contractors, whereby Legacy Sunlight provided a subset of its contractors with advance funding prior to the contractors completing installation of the company's systems. In other words, Legacy Sunlight's program gave money to contractors before any work was started. The structure of the program proved unique, as typically, companies financing home improvements do not pay contracts until projects are completed, instead forcing contractors to shoulder significant costs up-front before they receive funding.

5.     Prior to and following the Business Combination, the Company represented to investors that the unique structure of Legacy Sunlight's (and later, the Company's) cash advance program was a major draw for contractors when deciding which company to partner with for customer financing and, thus, made Sunlight a more desirable pursuit compared to its competitors. The Company further represented to investors that Legacy Sunlight (and following the Business Combination, the Company): (1) had implemented a stringent process to "vigorously" vet which contractors it accepted into its network and gave cash advances to; and (2) would perform "ongoing monitoring" even after it accepted a contractor for the cash advance program to assess, among other things, the contractor's financial condition, work quality, and legal compliance.

6.     Despite these promising assertions, in reality, the cash advance program put Legacy Sunlight (and later, the Company) at great risk. Although beneficial for contractors, Legacy Sunlight's cash advance program opened Legacy Sunlight (and later, the Company) up to substantial credit risk. However, throughout the Relevant Period, Defendants concealed this reality from investors.

7.     Worsening matters, Legacy Sunlight's (and later, the Company's) vetting and monitoring process for its contractors was extremely limited and proved deficient. Indeed, certain former Company employees who were witnesses in the Securities Class Action (defined below) described the Company's process for vetting and monitoring its contractors to be "lackadaisical" and noted that the Company was essentially "buying" contractors by luring them in with its cash advance program. The former employees also alleged that, despite Sunlight's claims to the contrary, the Company accepted any contractor willing to work with it, and monitoring of these contractors consisted only of the Company reviewing the contractors' self-provided financial statements once a year.

8.     Prior to and following the Business Combination, Defendants also misled investors into believing that the solar industry was experiencing a "rapid decline in costs" that was benefitting Legacy Sunlight (and later, the Company). In reality, the entire solar industry–including Legacy Sunlight (and later, the Company)–was suffering widespread issues with its supply chain and labor shortages, among other problems. These misrepresentations were made for the purpose of effectuating the Business Combination, which stood to financially benefit several of the Individual Defendants upon its completion.

9.     On January 25, 2021, Legacy Sunlight hosted a conference call with investors wherein it announced that it had entered into an agreement and plan of merger with Spartan (the "Merger Agreement"). In addition to announcing the proposed Business Combination, Defendants also represented on the conference call that Legacy Sunlight's cash advance program posed very little risk to Legacy Sunlight, noting that "[w]e structure these advances such that they're low risk to [Legacy] Sunlight, but provide significant benefit to [Legacy Sunlight's] contractors."

10.     Unbeknownst to the shareholders who approved the Business Combination (i.e., Spartan's shareholders), the value of the Business Combination was not in line with Defendants' representations. In fact, through the Business Combination, Spartan inherited a business plagued by issues pertaining to supply chain shortages and a high-risk cash advance program for contractors. By making a series of false and misleading statements and/or omissions during the Relevant Period, Defendants successfully deceived the investing public into approving the Business Combination, and with it, lucrative arrangements that materially benefitted insiders at Spartan and Legacy Sunlight to the Company's detriment. The full truth remained hidden from investors until after the Business Combination closed and the value of the Company's securities tanked to new lows.

11.     Prior to the Business Combination, Spartan operated as a special purpose acquisition company ("SPAC"), a publicly traded corporation with a two-year life span formed for the sole purpose of effecting a merger with a privately held business to enable it to go public. Spartan was founded in 2020 by Apollo Global Management, Inc. ("Apollo Global"). Apollo Global caused one of its affiliates, Spartan Acquisition Sponsor II LLC (the "Sponsor"), to purchase 8,625,000 shares of Spartan Class B Common Stock (the "Founder Shares") at nominal consideration before Spartan's initial public offering ("IPO"). Through the issuance of the Founder Shares, the Sponsor, its affiliates, and the Sponsor's directors and officers collectively owned approximately 20% of Spartan's issued and outstanding shares of common stock after Spartan's IPO.

12.     On November 30, 2020, Spartan closed its IPO, selling 34,500,000 units and generating gross proceeds of approximately $345 million. In addition, Spartan issued warrants to the Sponsor in a private placement that occurred simultaneously with the closing of the IPO.

Specifically, the Sponsor purchased an aggregate of 9,900,000 private placement warrants at a price of $1.00 per private placement warrant, for a purchase price of $9,900,000 (the "Private Placement Warrants").

13.     Following the closing of Spartan's IPO, $345 million of the net proceeds generated from the IPO and simultaneous private placement were placed in a trust account (the "Trust"), and these funds were to be released only upon the closing of a qualifying business combination, or in the case of liquidation to return the funds to Spartan's investors.

14.     However, as certain of the Individual Defendants had either a direct or indirect economic interest in the Founder Shares and Private Placement Warrants, their financial interests were misaligned with those of Spartan shareholders. These conflicts of interest only worsened once Spartan determined it would complete a business combination with Legacy Sunlight. Spartan had only 24 months from the date of the IPO's closing to complete a business combination. This meant that, in the event Spartan failed to complete a business combination by that time, Spartan would have had to: (1) cease all its operations, except those made for the purpose of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to Spartan's investors. Because each of Spartan's officers and directors agreed to waive their rights to liquidating distributions from the Trust, the $345 million Founder Shares and Private Placement Warrants would have been rendered worthless to them in the event Spartan failed to timely complete a business combination.

15.     Driven by their strong motivations to avoid liquidation of the Trust and cash out on their investments, the Individual Defendants affiliated with Spartan were highly motivated to quickly facilitate a business combination.

16.     To ensure that Spartan effectuated a proper business combination before the Trust was liquidated, Apollo Global and its affiliates packed Spartan's Board of Directors with those who had extensive backgrounds with Apollo Global. At the time of the Business Combination, Spartan's officers and five of its seven directors had deep ties to Apollo Global. To ensure that all seven Spartan directors would vote to approve the Business Combination, Apollo Global selected two directors from its previous SPAC, Spartan Energy Acquisition Corp., to fill the last two positions on Spartan's Board of Directors–Defendants Wilson and Stice. Apollo Global further incentivized Defendants Wilson and Stice to approve the Business Combination by providing each of them with 50,000 Founder Shares. These Founder Shares placed Defendants Wilson and Stice in a unique position: they would each receive a significant windfall of about $500,000 if a Business Combination were completed by Spartan's deadline but, alternatively, would be left with no compensation at all if no merger were effectuated by the deadline. As a result, Apollo Global caused Spartan's entire leadership, including the Spartan Defendants, to have deep conflicts of interest in the Business Combination.

17.     Between January 2021 and July 2021, Spartan and its advisors repeatedly represented to investors that they had conducted due diligence of Legacy Sunlight in anticipation of the proposed Business Combination. However, the reality was that, in the process leading up to the Business Combination, Apollo Global and its loyal associates making up Spartan's leadership refused to conduct sufficient due diligence of Legacy Sunlight or implement basic procedural safeguards for unaffiliated stockholders that would have risked interfering with the windfall they would have received upon the completion of the Business Combination. Indeed, Spartan's Board both failed to establish an independent committee to review the Business Combination and refused

to obtain any third-party fairness opinion to assess the fairness of the Business Combination for the unaffiliated stockholders.

18.  Because Spartan's due diligence of Legacy Sunlight was glaringly inadequate, prior to and following the Business Combination, Spartan unreasonably failed to: (1) investigate and confirm Legacy Sunlight's claims about having a "low risk" cash advance program for its contractors; or (2) investigate the supply chain concerns impacting the entire solar industry, including Legacy Sunlight.

19.  This information was highly material to investors in connection with the Business Combination because those who did not support Spartan's proposed Business Combination with Legacy Sunlight had the express right to redeem their stock for approximately $10 per share (the "Redemption Right"). According to the proxy statement and prospectus the Company filed on Form 424b3 with the SEC on June 21, 2021 (the "Merger Proxy Statement") in connection with the Business Combination, Spartan shareholders had to decide whether or not to exercise their Redemption Right by July 6, 2021 (the "Redemption Date").

20.  Spartan's Board also caused the Legacy Sunlight Defendants to share deep conflicts of interest. Spartan's Board offered eight figures worth of shares to certain Legacy Sunlight leaders to incentivize them to complete the Business Combination. As a result, the Business Combination held the prospect of multi-generational wealth for various Legacy Sunlight insiders.

21.  In order to ensure that Spartan shareholders would approve the proposed Business Combination and dissuade them from redeeming their shares, during the Relevant Period, certain of the Individual Defendants caused Spartan and Legacy Sunlight to tout a series of materially false and misleading statements and omissions regarding Legacy Sunlight and the post-Business Combination business and prospects. These statements were made in SEC filings, press releases,

interviews, and other public communications and misled the investing public about: (1) the level of risk that Legacy Sunlight faced as a result of its contractor advance program; (2) the extent to which supply chain concerns involving the overall solar industry undermined Legacy Sunlight's ability to effectively operate; and (3) the adequacy of Spartan's due diligence of Legacy Sunlight in connection with the proposed Business Combination.

22.     These matters directly impacted the Company's revenue projections and, as a result, the share price of the post-Business Combination Company's stock. Indeed, information regarding the true state of Legacy Sunlight was material to Spartan shareholders in deciding whether to redeem their shares of Spartan stock or invest in the post-Business Combination Company.

23.     Even so, throughout the Relevant Period, the Individual Defendants misled Spartan shareholders as to the true state of Legacy Sunlight (and the potential benefits of investing in the post-Business Combination Company) to garner shareholder approval for the Business Combination. Moreover, the Merger Proxy Statement also overstated Legacy Sunlight's value through projections that remained inflated, in spite of certain reevaluations as concerning news continued to emerge, failed to disclose material issues concerning the interests that Legacy Sunlight's and Spartan's executive officers and directors had in the Business Combination, failed to disclose the value of Founder Shares and Private Placement Warrants held by Company insiders, and misrepresented the value of Spartan's own shares given the impact of dilution. As a result of the false and misleading Merger Proxy Statement, Company shareholders voted, *inter alia*, to approve the Business Combination and approve a lucrative incentive plan which provided benefits to the post-Business Combination Company's directors and officers (discussed in further detail below).

24.     This deception allowed the Business Combination to close on terms that were unreasonable and unfavorable to the Company and its shareholders, given the known yet undisclosed state of affairs at Legacy Sunlight (the "Overpayment Misconduct"). On July 8, 2021, Spartan's stockholders approved the Business Combination, effectively waiving their Redemption Rights. Under the terms of the Business Combination, Legacy Sunlight's former shareholders would receive approximately 50% ownership of the Company, while Spartan's shareholders would receive only 26% ownership. The Spartan Defendants were motivated to engage in the Overpayment Misconduct given that they would personally benefit from the Business Combination through the receipt of substantial renumeration in the form of compensation and stock awards. The Legacy Sunlight Defendants were motivated to aid and abet this misconduct because they also stood to personally benefit from the Business Combination's consummation.

25.     The truth about Legacy Sunlight began to emerge on August 16, 2021, when the Company hosted an earnings call to discuss various problems it was facing. On the call, Defendants Edinburg and Potere revealed that (1) the Company had experienced a "margin decrease" that was harming it; and (2) the solar industry was experiencing significant supply chain problems, delays, and labor shortages, issues which had also plagued Legacy Sunlight prior to the Business Combination but which had remained hidden from shareholders up until the August 16, 2021 call.

26.     On this news, the Company's share price dropped $1.98, from a close of $7.40 per share on August 16, 2021, to close at $5.42 per share on August 17, 2021.

27.     As the supply chain issues and the Company's false statements pertaining to them came to light, the Company's troubles with its contractor advance program continued. Throughout the Relevant Period, the Company repeatedly represented to investors that it "structure[d] these

[contractor] advances such that they're low risk to Sunlight, but provide significant benefit to [Sunlight's] contractors."

28.     The truth emerged on September 28, 2022 when, after the market closed, the Company revealed that it would record a "non-cash advance receivables impairment charge of $30 million to $33 million during the Company's fiscal quarter ending September 30, 2022." In making this announcement, Sunlight explained that "the Company was informed of certain actions taken by one of its installer partners to address liquidity issues faced by the installer" which "would likely result in an inability of the Company to collect on advances outstanding to such installer." This reality was devastating for the Company, as the loss ***exceeded the Company's entire revenues for the second quarter of 2020***.

29.     Sunlight also issued a press release the same day in which the Company revealed it was withdrawing its full-year 2020 outlook due to the "installer liquidity event." The press release quoted Defendant Potere as saying, "[w]hile our risk exposure with other contractor advances is much smaller (the next three largest partner advances being $10 million, $7 million, and $5 million respectively), ***we are re-underwriting all contractor partners' advances to further mitigate risk going forward***." (Emphasis added.)

30.     Moreover, Defendant Potere's statements revealing that the Company was re-underwriting ***all*** contractor partners' advances indicated that the loss was not an isolated incident and instead was representative of Sunlight's deficient process for vetting and monitoring contractors prior to providing them with cash advances under its financing program.

31.     On this news, Sunlight's stock price fell $1.44 per share, or 57.1%, from a closing price of $2.52 per share on September 28, 2022 to close at $1.08 per share on September 29, 2022.

32.     Soon after this news reached the market, analysts determined that the Company partner who had faced the severe liquidity issue was a company called Pink Energy, which had been embroiled in controversy for years. Had Sunlight performed the adequate due diligence and continuous monitoring of contractors that the Company claimed it did, Sunlight would have discovered the problems with Pink Energy long before the Company shouldered the non-cash advance receivables impairment charge of $30 million to $33 million.

33.     During the Relevant Period and up until August 16, 2021, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Sunlight's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the entire solar industry was facing severe supply chain issues, labor delays, and shortages; (2) due to these widespread issues, the costs of the materials needed to build solar panels were rapidly increasing; and (3) as a result, the Company had experienced a "margin decrease" that was harming the Company. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

34.     During the Relevant Period, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge

exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

35.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. The Individual Defendants further breached their fiduciary duties by causing Sunlight to repurchase its own stock at artificially inflated rates. Indeed, between January 2021 and September 2022, approximately 4,631,947 shares of Sunlight common stock were repurchased, costing the Company almost $25.2 million. Since the repurchased stock was only worth $1.08 per share, which was the price at close of trading on September 29, 2022, Sunlight overpaid by over $20.2 million.

36.     Moreover, the Legacy Sunlight Defendants aided and abetted the breaches of fiduciary duties engaged in by the Spartan Defendants, who caused and permitted Spartan to issue false and misleading statements about Legacy Sunlight, the Business Combination, and the Company. While the Legacy Sunlight Defendants knew the truth of these matters, they failed to correct the false and misleading statements.

37.     Likewise, the Spartan Defendants breached their fiduciary duties to the Company by agreeing to the Business Combination despite participating in the Overpayment Misconduct.

38.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

39.     Moreover, several of the Individual Defendants materially benefited from shareholder approval of the Plan (defined below), which provided certain of the Individual Defendants, including members of the Board, with the opportunity to receive stock awards, options, and other renumeration beyond their ordinary director compensation.

40. In light of the Individual Defendants' misconduct—which has subjected the Company and various of the Individual Defendants to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"); which has subjected the Company and various of the Individual Defendants to a securities fraud class action lawsuit pending in the Court of Chancery of the State of Delaware (the "Delaware Class Action," and together with the Securities Class Action, the Securities Class Actions) and which has further subjected the Company to the need to undertake internal investigations, the need to remedy the Overpayment Misconduct, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

41. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the Individual Defendants' and the Company's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §

78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

43. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

44. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

45. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

46. Plaintiff is a current shareholder of Sunlight. Plaintiff has continuously held Sunlight common stock since he purchased it on February 2, 2021.

### Nominal Defendant Sunlight

47. Sunlight is a Delaware corporation with its principal executive offices at 101 North Tryon Street, Suite 1000, Charlotte, NC 28246. Sunlight common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SUNL."

### Defendant Potere

48. Defendant Potere is the Company's CEO and has served as a Company director since the Business Combination. Prior to this, Defendant Potere served as the CEO and as a member of the board of directors for Legacy Sunlight from 2015 until the consummation of the

Business Combination. According to the proxy statement that the Company filed with the SEC on July 7, 2023 (the "2023 Proxy Statement"), as of June 21, 2023, Defendant Potere beneficially owned 3,820,265 shares of the Company's common stock, representing 2.2% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on June 21, 2023 was $0.35, Defendant Potere owned approximately $1,337,093 worth of Sunlight stock.

49.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Potere received $418,443 in total compensation from the Company. This included $392,000 in salary and $26,443 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Potere received $5,162,021 in total compensation from the Company. This included $300,000 in salary, $4,824,600 in stock awards, and $37,421 in all other compensation.

50.     The 2023 Proxy Statement stated the following about Defendant Potere:

Mr. Potere is the Chief Executive Officer and a Class III member of the Sunlight Board. Mr. Potere served as Chief Executive Officer and a member of the board of directors for Sunlight LLC from 2015 until consummation of the Business Combination. Prior to Sunlight LLC, Mr. Potere served as a Senior Vice President responsible for Bank of America, N.A.'s home equity product from 2012 to 2015. Prior to Bank of America, Mr. Potere served as the Chief Operating Officer of Swift Financial from 2007 to 2010, and in various senior credit, marketing and operations roles at MBNAAmerica Bank, N.A. from 1995 to 2006. Mr. Potere holds a B.A. in Criminal Justice from the University of Delaware.

We believe Mr. Potere is qualified to serve as a member of the Board due to his extensive executive management and lending industry leadership experience.

**Defendant Edinburg**

51.     Defendant Edinburg served as the Company's CFO from the Business Combination until he retired effective March 31, 2022. Prior to this, Defendant Edinburg served as the CFO of Legacy Sunlight from 2016 until the Business Combination.

52.     For the 2021 Fiscal Year, Defendant Edinburg received $1,229,691 in total compensation from the Company. This included $300,000 in base salary, $125,000 in bonus, $784,234 in stock awards, and $20,457 in all other compensation.

53.     The Merger Proxy Statement stated the following about Defendant Edinburg:

*Barry Edinburg*.    Mr. Edinburg has served as Sunlight's Chief Financial Officer since 2016. Prior to Sunlight, Mr. Edinburg served as Chief Financial Officer of Spruce Finance Inc. from 2015 to 2016 and in the same role at Kilowatt Financial LLC from 2013 until the time of its merger with Clean Power Finance, Inc. to form Spruce Finance. Prior to Kilowatt Financial, Mr. Edinburg was a Managing Director at Fortress Investment Group from 2004 to 2012, where he was responsible for both making and managing private equity investments in financial services and other business and generally for the capital markets activities of portfolio companies. Mr. Edinburg holds a B.A. in Psychology from Tufts University and a J.D. from the Boston University School of Law.

**Defendant Yoder**

54.     Defendant Yoder is the Executive Vice President and CFO of Sunlight and has served in such role since April 2022.

55.     The annual report the Company filed on Form 10-K with the SEC on May 4, 2023 for the fiscal year ended December 31, 2022 (the "2022 10-K") stated the following about Defendant Yoder:

Mr. Yoder is the Executive Vice President and Chief Financial Officer of Sunlight and has served in such role since April 2022. Mr. Yoder has over 25 years of experience in financial planning, treasury, and consumer credit. Prior to Sunlight, Mr. Yoder served in increasing roles of responsibility at Barclays from 2010 until 2022, and served as Treasurer of Swift Financial from 2007 to 2010. Mr. Yoder started his career at MBNA America, which was acquired by Bank of America, where he spent 16 years in a variety of roles, including as CFO for Merchant Acquiring. Mr. Yoder holds a B.S. and an MBA from the Alfred Lerner College of Business & Economics from the University of Delaware.

**Defendant Strong**

56.     Defendant Strong served as CEO of Spartan from August 17, 2020 until the Business Combination and as Chairman of its Board of Directors from January 19, 2021 until the

Business Combination. At the time of the Business Combination, Defendant Strong was also an employee of Apollo Global, serving as a Senior Partner and Co-Lead of the firm's Global Infrastructure and Natural Resources groups.

57. The Merger Proxy Statement stated the following about Defendant Strong:

*Geoffrey Strong* — Chief Executive Officer and Chairman. Geoffrey Strong has served as our Chief Executive Officer since August 17, 2020 and Chairman of the Spartan Board since January 19, 2021. He is also the Chief Executive Officer and Chairman of Spartan Acquisition Corp. III. Mr. Strong joined Apollo in 2012 and is currently a Senior Partner and Co-Lead of the firm's Global Infrastructure and Natural Resources groups. Previously, he worked in the Private Equity and Infrastructure groups at Blackstone, focusing primarily on investments in the energy sector, and prior to that, as a vice president at Morgan Stanley Capital Partners. Mr. Strong serves or has served on the board of directors of various Apollo portfolio companies or affiliates, including: Apex Energy; AIE Arlington, LLC; AIE Caledonia Holdings LLC; Caelus Energy; Chisholm Oil and Gas; CPV Fairview; DoublePoint Energy, LLC; Double Eagle Energy Holdings, LLC; Double Eagle Energy Holdings II, LLC; Double Eagle Energy Holdings III LLC; Freestone Midstream; Momentum Minerals I; Momentum Minerals II; Northwoods Energy; Pipeline Funding Company LLC; Roundtable Energy; Spartan Energy Acquisition Corp.; Tumbleweed Royalty I; Tumbleweed Royalty II; and Vistra Energy. Mr. Strong holds a Bachelor of Science, summa cum laude, in business administration from Western Oregon University, a juris doctor, cum laude, from Lewis & Clark College, and a Masters of Business Administration from the University of Pennsylvania's Wharton School of Business. Mr. Strong's extensive experience investing in the energy value chain makes him a valuable addition to our management team and the Spartan Board.

**Defendant Crossen**

58. Defendant Crossen served as the Company's CFO and Chief Accounting Officer from August 2020 until the Business Combination.

59. The Merger Proxy Statement stated the following about Defendant Crossen:

*James Crossen* — Chief Financial Officer and Chief Accounting Officer. Mr. Crossen has served as our Chief Financial Officer and Chief Accounting Officer since August 17, 2020. Mr. Crossen is Chief Financial Officer and Chief Accounting Officer of Spartan Acquisition Corp. III, Apollo Strategic Growth Capital and Apollo Strategic Growth Capital II, and is the Chief Financial Officer for Private Equity and Real Assets at Apollo, having joined the firm in 2010. He was Chief Financial Officer and Chief Accounting Officer of Spartan Energy

Acquisition Corp. from October 2017 until October 2020 Prior to joining Apollo, Mr. Crossen was a Controller at Roundtable Investment Partners LLC. Prior thereto, Mr. Crossen was a Controller at Fortress Investment Group. Prior to that time, Mr. Crossen was a member of the Funds Management and Tax Group at JP Morgan Partners LLC. Mr. Crossen is a Certified Public Accountant in New York. Mr. Crossen served in the United States Marine Corps and graduated summa cum laude from the University of Connecticut.

**Defendant Wassenaar**

60.     Defendant Wassenaar served as a Spartan director from November 24, 2020 until the Business Combination. Defendant Wassenaar has also worked for Apollo Global since 2018. At the time the Prospectus was issued, Defendant Wassenaar was a Senior Partner in Apollo Global's New York office.

61.     The Merger Proxy Statement stated the following about Defendant Wassenaar:

*Olivia C. Wassenaar* — Director. Ms. Wassenaar joined Apollo in August 2018, where she is currently a Senior Partner in the New York office and Co-Lead of the firm's Global Natural Resources group. Prior to joining Apollo, Ms. Wassenaar was associated with Riverstone Holdings since 2008 and most recently served as a Managing Director, where she was involved in investments throughout the energy sector. Prior to joining Riverstone Holdings, Ms. Wassenaar was with Goldman, Sachs & Co. in the Global Natural Resources investment banking group. Previously, Ms. Wassenaar was a Junior Professional Associate at The World Bank Group in Washington, D.C. Ms. Wassenaar currently serves on the board of Talos Energy Inc., LifePoint Health, Inc. and High Road Resources. She has also served on the board of directors of various private companies. Additionally, she previously served on the boards of Northern Blizzard Resources Inc., USA Compression Partners, LP and Niska Gas Storage Partners LLC. She received her AB, magna cum laude from Harvard College and an MBA from the Wharton School at the University of Pennsylvania. We believe that Ms. Wassenaar's experience in evaluating financial and strategic options and the operations of companies in our industry and her experience on multiple boards make her a valuable member of the Spartan Board.

**Defendant Handler**

62.     Defendant Handler served as a Spartan director from November 24, 2020 until the Business Combination. Defendant Handler has also worked for Apollo Global since 2011. At the

time the Prospectus was issued, Defendant Handler was a member of Apollo Global's Natural Resources group.

63.     The Merger Proxy Statement stated the following about Defendant Handler:

**Wilson Handler** — Director. Mr. Handler joined Apollo in 2011 and is a member of the firm's Natural Resources group. Prior to joining Apollo, Mr. Handler was an investment professional at First Reserve, where he was involved in the execution and monitoring of investments in the energy sector. Previously, he worked in the Investment Banking Division at Lehman Brothers in the Natural Resources group. Currently, Mr. Handler serves or has served on the board of directors of various companies, including: EP Energy Corporation; CSV Midstream Solutions GP LLC; Jupiter Resources GP LLC; Resource Energy Partners, LLC; Tumbleweed Royalty, LLC; Tumbleweed Royalty II, LLC; Mesquite Energy Inc. (f/k/a Sanchez Energy Corp.); American Petroleum Partners, LLC (n/k/a High Road Resources, LLC); Athlon Energy Inc.; DoublePoint Energy, LLC; Double Eagle Energy Holdings II LLC; Double Eagle Energy Holdings III LLC and Wolfcamp DrillCo LLC. Mr. Handler holds a Bachelor of Arts in Economics and Government from Dartmouth College. Mr. Handler's extensive experience investing in the energy value chain makes him a valuable addition to the Spartan Board.

### Defendant Hommes

64.     Defendant Hommes served as a Spartan director from November 24, 2020 until the Business Combination. Defendant Hommes has also worked for Apollo Global since 2011. At the time the Prospectus was issued, Defendant Hommes was a partner in Apollo Global's Natural Resources group.

65.     The Merger Proxy Statement stated the following about Defendant Hommes:

**Christine Hommes** — Director. Ms. Hommes joined Apollo in January 2011 and is a Partner in the Natural Resources group. Prior to that time, Ms. Hommes was an Associate at First Reserve and prior to that, a member of the Power & Utilities Group at UBS. Ms. Hommes currently serves on the board of directors of Talos Energy Inc., Chisholm Oil & Gas, Momentum Minerals, Momentum Minerals II, Belvedere Royalties, LLC, Boardwalk Holdings, LLC (parent of Celeros Flow Technology), Freestone Midstream Holdings, LLC, Northwoods Energy LLC and Roundtable Energy Holdings. Ms. Hommes also serves on the board of directors of Youth, Inc. a non-profit focused on New York City youth. She previously served on the board of Tumbleweed Royalty. Ms. Hommes graduated summa cum laude from the University of Pennsylvania with a BS in Economics and a BAS in Systems Engineering. We believe that Ms. Hommes' experience in evaluating financial and

strategic options and the operations of companies in our industry make her a valuable member of the Spartan Board.

**Defendant Romeo**

66.     Defendant Romeo served as a Spartan director from November 24, 2020 until the

Business Combination. Defendant Romeo has also worked for Apollo Global since 2013.

67.     The Merger Proxy Statement stated the following about Defendant Romeo:

***Joseph Romeo*** — Director. Mr. Romeo joined Apollo Private Equity in 2013 and is focused on natural resources activities in addition to co-leading Spartan I from IPO to business combination. Prior to that time, Mr. Romeo was a member of the Energy Financial Services group at General Electric focused on evaluating, executing and managing principal investments in the energy sector. Mr. Romeo also serves on the board of directors of various Apollo portfolio companies, including Apex Energy, LLC, Caelus Energy Alaska, LLC, Freestone Midstream Holdings, LLC, High Road Resources, LLC (f.k.a. American Petroleum Partners), Northwoods Energy, LLC, and Roundtable Energy Holdings, LLC. Mr. Romeo graduated from Princeton University with an AB in Politics and received his MBA from Harvard Business School. Mr. Romeo's extensive experience investing in the energy value chain makes him a valuable addition to the Spartan Board.

**Defendant Wilson**

68.     Defendant Wilson served as a Spartan director from November 24, 2020 until the

Business Combination.

69.     The Merger Proxy Statement stated the following about Defendant Wilson:

***Jan C. Wilson*** — Independent Director. Ms. Wilson served as a consultant to the Royal Bank of Canada from September 2015 until April 2017. Prior to her service as a consultant to the Royal Bank of Canada, Ms. Wilson was a manager at Enron Corporation from May 1996 until January 2002, senior vice president of RBS Sempra Commodities LLC from January 2002 until January 2011 and director of Freepoint Commodities LLC from June 2011 until June 2013. Since April 2018, Ms. Wilson has served as a senior advisor for the Canada Pension Plan Investment Board and is the founder/president of JW 1000 Ltd. a company focused on advising on all project contracts that are required to support financing and allocation of risk for sustainable energy projects. Ms. Wilson served on the board of directors of Spartan Energy Acquisition Corp. and serves on the board of directors of Crestone Peak Resources. Ms. Wilson was a private investor from March 2015 to August 2015 and from April 2017 through March 2018. Ms. Wilson holds a B.A. in Economics and a B.A. in Honours Business Administration from the University

of Western Ontario and an M.B.A. from Queens University. Ms. Wilson is well-qualified to serve as director due to her extensive experience in risk management and asset acquisition in the electricity, oil & gas and energy storage industries.

**Defendant Stice**

70.     Defendant Stice served as a Spartan director from November 24, 2020 until the Business Combination.

71.     The Merger Proxy Statement stated the following about Defendant Stice:

*John M. Stice* — Independent Director. Mr. Stice previously served as Chief Executive Officer of Access Midstream from the time it spun out of Chesapeake Energy until his retirement in 2015. Mr. Stice began his career in 1981 with Conoco, as an associate engineer. For more than 25 years, Mr. Stice held technical and managerial positions of increasing responsibility with ConocoPhillips in exploration, production, midstream, and gas marketing worldwide. In November 2008, Mr. Stice joined Chesapeake and served as President of Chesapeake Midstream Development and Senior Vice President of Natural Gas Projects for Chesapeake Energy. He retired in 2015 as Chief Executive Officer of Access Midstream, formerly Chesapeake Midstream Partners. Currently, Mr. Stice serves as Dean of the Mewbourne College of Earth & Energy at the University of Oklahoma, a position he assumed in August 2015. Mr. Stice served on the board of directors of Spartan Energy Acquisition Corp. Mr. Stice serves on the boards of directors of Marathon Petroleum Corporation, MPLX and U.S. Silica Holdings, Inc. Mr. Stice holds a bachelor's degree in chemical engineering from the University of Oklahoma, a master's degree in business from Stanford University, and a doctorate in education from The George Washington University. As a result of his professional and academic experiences, Mr. Stice brings extensive breadth, depth and expertise in the oil and natural gas services industry to the Spartan Board.

**Defendant Bernstein**

72.     Defendant Bernstein has served as a Company director since the Business Combination. Prior to this, Defendant Bernstein served as a director of Legacy Sunlight from 2018 until the Business Combination.

73.     For the 2022 Fiscal Year, Defendant Bernstein received $50,000 in total compensation from the Company made up entirely of fees earned or paid in cash. For the 2021

Fiscal Year, Defendant Bernstein received $23,777 in total compensation from the Company made up entirely of fees earned or paid in cash.

74. The 2023 Proxy Statement stated the following about Defendant Bernstein:

Mr. Bernstein is managing partner of FTV Capital and leads the sector-focused growth equity investment firm, a position he has held since 2016. Mr. Bernstein has over 30 years of private equity experience. Prior to FTV Capital in 2003, Mr. Bernstein was a partner at Oak Hill Capital Management and its predecessors from 1992 to 2003, where he managed the business and financial services group. He began his private equity career with Patricof & Company Ventures in 1991 and started his professional career in the investment banking division of Merrill Lynch in New York in 1989. Mr. Bernstein currently serves as a director of Enfusion, Inc., where he also serves on the compensation committee, and several of FTV Capital private portfolio companies. Mr. Bernstein received a B.A. magna cum laude from Tufts University.

We believe Mr. Bernstein is qualified to serve as a member of the Board due to his leadership and management experience.

**Defendant Gorgas**

75. Defendant Gorgas has served as a Company director since 2021. She also serves as Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of June 21, 2023, Defendant Gorgas beneficially owned 41,104 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 21, 2023 was $0.35, Defendant Gorgas owned approximately $14,386 worth of Sunlight stock.

76. For the 2022 Fiscal Year, Defendant Gorgas received $190,000 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $125,000 in stock awards. For the 2021 Fiscal Year, Defendant Gorgas received $149,160 in total compensation from the Company. This included $30,910 in fees earned or paid in cash and $118,250 in stock awards.

77. The 2023 Proxy Statement stated the following about Defendant Gorgas:

Ms. Gorgas is a board director and C-Suite executive with 25+ years of expertise in growth strategy, operations, risk management, mergers and acquisitions, and human capital management. Ms. Gorgas is a board member of NDH LLP and Delivery Hero (DLVHF), a technology company, where she chairs the Strategy Committee and serves on the Audit and Nominations Committees. Ms. Gorgas previously served on the Board of Directors of Youth INC, and was a member of the Audit and Nominating & Governance committees. Ms. Gorgas has served in a multitude of C-Suite roles, including those of Chief Strategy Officer, Chief Administrative Officer and Chief Human Capital Officer. As Chief Strategy Officer at Grant Thornton LLP, she built and led the Office of Strategy Management and led a team of 65 people in strategic planning, mergers & acquisitions, alliances, strategic initiative execution, knowledge management technology, change management and corporate social responsibility. She played a vital role in developing and launching the firm's innovation platform, and in growing the U.S. firm's revenues by more than 28% in two years. She served at Grant Thornton from 2015 to 2018. Ms. Gorgas has held senior roles in Valor Equity Partners (from 2019 to 2020), Deutsche Bank (from 1998 to 2010), Bank of America (from June to December 2010) and Weil, Gotshal & Manges (from 2013 to 2015), with ever-increasing responsibilities. She was also Senior Associate Dean for Yale University from 2011 to 2013, leading all facets of the MBA Program at Yale School of Management. Ms. Gorgas graduated with high honors from London School of Economics with a Master of Science (MSc) in Management. She earned a Bachelor of Science degree from Rutgers' College School of Business, and attended Harvard Business School's Advanced Management and Women on Boards programs.

We believe Ms. Gorgas is qualified to serve as a member of the Board due to her substantial experience in strategy planning and execution, human capital management, and her proven track record contributing to organizational growth across private and public companies.

**<u>Defendant Henry</u>**

78.     Defendant Henry is Chairman of the Board and has served as a Company director since the Business Combination. Prior to this, Defendant Henry served as a director of Legacy Sunlight from 2015 until the Business Combination. According to the 2023 Proxy Statement, as of June 21, 2023, Defendant Henry beneficially owned 29,616,922 shares of the Company's common stock, representing 17.3% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on June 21, 2023 was $0.35, Defendant Henry owned approximately $10.4 million worth of Sunlight stock.

79.    For the 2022 Fiscal Year, Defendant Henry received $50,000 in total compensation from the Company made up entirely of fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Henry received $23,777 in total compensation from the Company made up entirely of fees earned or paid in cash.

80.    The 2023 Proxy Statement stated the following about Defendant Henry:

Mr. Henry is the CEO and Founder of Tiger Infrastructure Partners, a private equity firm focused on growth-oriented infrastructure investment opportunities, a position he has held since 2010. Prior to founding Tiger Infrastructure Partners, he was Global Head of the Lehman Brothers Private Equity Infrastructure businesses from 2007 to 2008, where he oversaw global infrastructure investments. Mr. Henry currently serves on the board of directors for Arrowmark Financial Corp, Easterly Government Properties, Inc. and several of Tiger Infrastructure private portfolio companies. In 2005, Mr. Henry was unanimously confirmed by the United States Senate as Assistant Secretary of the Treasury for Financial Institutions. Until his departure in 2007, he was a key advisor to two Treasury Secretaries on economic, legislative and regulatory matters affecting U.S. financial institutions and markets. Before joining the Treasury, Mr. Henry was a partner of Gleacher Partners LLC, an investment banking and investment management firm, where he served as Chairman of Asset Management, and Managing Director, and where he oversaw the firm's investment activities. He began at Gleacher Partners in 1990. Mr. Henry began the formative part of his career at Morgan Stanley in the mid-1980s in that firm's merchant banking arm where he executed management buyouts for Morgan Stanley's flagship private equity fund. He holds an M.B.A. from Harvard Business School and a B.A. in Economics from Yale University.

We believe Mr. Henry is qualified to serve as a member of the Board due to his expertise in the financial institution industry.

**Defendant Huynh**

81.    Defendant Huynh has served as a Company director since 2021. She also serves as Chair of the Nominating, Governance & ESG Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of June 21, 2023, Defendant Huynh beneficially owned 41,104 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 21, 2023 was $0.35, Defendant Huynh owned approximately $14,386 worth of Sunlight stock.

82.    For the 2022 Fiscal Year, Defendant Huynh received $195,000 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $125,000 in stock awards. For the 2021 Fiscal Year, Defendant Huynh received $151,538 in total compensation from the Company. This included $33,288 in fees earned or paid in cash and $118,250 in stock awards.

83.    The 2023 Proxy Statement stated the following about Defendant Huynh:

Ms. Huynh has spent over 20 years working at the intersection of financial services and technology, leading large digital transformation projects for global 1000 firms. In 2008, she co-founded and served as Head of Insurance and Financial Services for Global One/Cloud Sherpas, a global cloud advisory firm, which was acquired by Accenture in 2015. Ms. Huynh remained as a Managing Director with Accenture's CloudFirst Practice until 2018, while running various innovation programs including the Fintech Innovation Lab with the Partnership Fund for New York City and launching the Liquid Studios for Innovation. After spending over fifteen years investing in Series A companies, in 2018, she joined Citi Ventures as an Entrepreneur-in-Residence to launch new financial products within the Consumer Bank and Institutional Corporate Group divisions. In addition, she joined Information VP in 2018 as a US-based partner, investing in B2B SaaS, financial services technologies, and enterprise technologies in North America and advising as a growth advisor until 2020. In 2020, she became a Partner at Momentum Partners, joining a team of operations-focused advisors working with growth-stage firms. She has served on the board of New York Community Bancorp since December 2022, where she serves on the risk assessment and technology committees, the board of Flagstar Bank since December 2020, where she serves on the Credit, Risk and Technology Committees. Since 2021, Ms. Huynh also serves as an EIR with Morgan Stanley Inclusive Ventures Lab. Ms. Huynh also previously served on the board of Phillips Edison REIT III, Inc. Ms. Huynh holds a BA from the University of Pennsylvania in International Relations and Economics. In her spare time, Ms. Huynh seeks to link the arts as a bridge to a common language, volunteering with OpeningAct.org, WordswithoutBorders.org, and Lincoln Center Innovation Center. She is also on the Board of Trustees for The Ethel Walker School for Girls and Penn Women's Alliance Advisory Council.

We believe Ms. Huynh is qualified to serve as a member of the Board due to her experience in early-stage companies and the financial services industry.

**Defendant Nordquist**

84.     Defendant Nordquist has served as a Company director since 2021. She also serves

as a member of the Compensation Committee and as a member of the Nominating, Governance &

ESG Committee. According to the 2023 Proxy Statement, as of June 21, 2023, Defendant

Nordquist beneficially owned 41,104 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on June 21, 2023 was $0.35,

Defendant Nordquist owned approximately $14,386 worth of Sunlight stock.

85.     For the 2022 Fiscal Year, Defendant Nordquist received $187,500 in total

compensation from the Company. This included $62,500 in fees earned or paid in cash and

$125,000 in stock awards. For the 2021 Fiscal Year, Defendant Nordquist received $147,971 in

total compensation from the Company. This included $29,721 in fees earned or paid in cash and

$118,250 in stock awards.

86.     The 2023 Proxy Statement stated the following about Defendant Nordquist:

Ms. Nordquist has 30 years of experience in public policy, research, government
and the private sector. She is currently Executive Vice President of the Economic
Innovation Group, a position she has held since 2021; serves on the Advisory Board
of Big Sun Holdings; is a Fellow at the University of Virginia Darden School of
Business; is an Advisory Board Member at ClearPath; is a Senior Adviser at the
Center for Strategic and International Studies; is an Economy Panel Adviser to the
Special Competitive Studies Project; is an Adviser to the Atlantic Council Global
Tech Security Commission; and in 2023, was appointed by Governor Youngkin to
the Virginia Biotechnology Research Partnership Authority. Confirmed
unanimously by the United States Senate, from 2019 to 2021 she represented the
United States at the Board of Directors of the World Bank Group, where she was a
member of the Audit Committee, the Committee on Development Effectiveness,
and the Committee on Governance. Ms. Nordquist also served as Chief of Staff at
the Council of Economic Advisers in the White House from 2017 to 2019; Chief
of Staff for the Economic Studies program at the Brookings Institution from 2008
to 2017; Assistant Secretary at the U.S. Department of Housing and Urban
Development from 2007 to 2008; Senior Advisor in the Office of the Federal
Coordinator for Gulf Coast Rebuilding from 2005 to 2007; Deputy Chief of Staff
at the Federal Deposit Insurance Corporation from June to October 2005; and
Deputy Assistant Secretary at the U.S. Department of Education from 2003 to 2005.
She also worked in the private sector in France and Thailand, and worked on
Capitol Hill. She holds a BA from Stanford University and an MS from

Northwestern University and received the Distinguished Service Award from the U.S. Department of the Treasury.

We believe Ms. Norquist is qualified to serve as a member of the Board due to her extensive experience in economics and public policy.

**Defendant Ryan**

87.    Defendant Ryan has served as a Company director since 2021. He also serves as Chair of the Audit Committee. According to the 2023 Proxy Statement, as of June 21, 2023, Defendant Ryan beneficially owned 41,104 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 21, 2023 was $0.35, Defendant Ryan owned approximately $14,386 worth of Sunlight stock.

88.    For the 2022 Fiscal Year, Defendant Ryan received $195,000 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $125,000 in stock awards. For the 2021 Fiscal Year, Defendant Ryan received $151,538 in total compensation from the Company. This included $33,288 in fees earned or paid in cash and $118,250 in stock awards.

89.    The 2023 Proxy Statement stated the following about Defendant Ryan:

Mr. Ryan has served on the board of directors of Swiss Re Americas Holding Corporation since 2010 and as Chairman since 2012. Mr. Ryan joined the Board of Directors of Swiss Re Ltd, the parent company, in April 2015. Mr. Ryan served as Executive Vice President and Chief Financial Officer of Power Corporation of Canada and Power Financial Corporation in Montreal from January 2008 to May 2012 and in that capacity served on the board and committees of IGM Financial, Great West Lifeco and several of their subsidiaries, including Putnam Investments. Prior to that Mr. Ryan served as an officer of Credit Suisse Group in New York, London and Zurich from 1985 to 2008 in a variety of roles, including Chairman of the Financial Institutions Group (UK), Chief Financial Officer of Credit Suisse Group (Switzerland), Chief Financial Officer of Credit Suisse Asset Management (UK) and Managing Director of CSFB Financial Institutions Group (USA/UK). Mr. Ryan is also engaged in a number of charitable activities including the Smithsonian National Board. Mr. Ryan is an advisor to MKB Growth Capital active in renewable energy and transportation and FTV Capital active in financial technology. He is also a member of the New York Green Bank Advisory Board. Mr. Ryan received a B.S. from the University of Illinois School of Engineering and an M.B.A. from the Indiana University Kelly Graduate School of Business.

We believe Mr. Ryan is qualified to serve as a member of the Board due to his leadership experience in the financial institutions industry.

**Defendant Shea**

90. Defendant Shea has served as a Company director since 2021. He also serves as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of June 21, 2023, Defendant Shea beneficially owned 41,104 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 21, 2023 was $0.35, Defendant Shea owned approximately $14,386 worth of Sunlight stock.

91. For the 2022 Fiscal Year, Defendant Shea received $207,500 in total compensation from the Company. This included $82,500 in fees earned or paid in cash and $125,000 in stock awards. For the 2021 Fiscal Year, Defendant Shea received $157,482 in total compensation from the Company. This included $39,232 in fees earned or paid in cash and $118,250 in stock awards.

92. The 2023 Proxy Statement stated the following about Defendant Shea:

Mr. Shea is a Co-Founder and Managing Principal of Manufactured Housing Partners, LLC, ("MHP LLC") a private, real estate investment fund focused on the acquisition and operation of manufactured housing communities. Prior to founding MHP LLC in 2022, Mr. Shea was an Investment Partner with Pilot Growth Equity, a venture capital firm focused on growth-stage technology companies, from 2020 to 2022. Previously, Mr. Shea was a Senior Managing Director at Guggenheim Securities, LLC, from 2014 to 2019, where he ran the Firm's Real Estate, Gaming & Leisure investment banking department; President of Coastal Capital Management, LLC, a developer of luxury resort & entertainment properties from 2009 to 2014; a Managing Director for Icahn Capital LP, from 2008 to 2009; and a Senior Managing Director at Bear, Stearns & Co. Inc, where he ran the Firm's Gaming & Leisure Investment Banking practice, and was employed from 1996 to 2008. Mr. Shea currently serves on the Board of Directors of Viskase Companies, Inc, a food-packaging company, where he is a member of the Audit Committee; Kindred Group, Plc, a Stockholm-based online casino & sports wagering company, where he is a member of the Audit Committee; and Lifepoint Health, a privately-held provider of health care services. Previously, Mr. Shea served on the boards of Equity Commonwealth, a commercial office REIT, where he was Chairman of the Compensation Committee; Hydra Industries, a special purpose acquisition company which successfully completed the acquisition of Inspired Entertainment,

a gaming company in the United Kingdom; Perthera.ai, a venture-backed data science company in the precision medicine sector; and CVR Refining, a mid-continent refiner, where he served as Chairman of the Audit Committee. Mr. Shea received his MBA from the University of Virginia, and his BA in Economics, Magna cum laude, from Boston College.

We believe Mr. Shea is qualified to serve as a member of the Board due to his extensive experience in corporate finance and financial services and his knowledge of the capital markets.

### Defendant Siegel

93.     Defendant Siegel has served as a Company director since 2021. He also serves as a member of the Audit Committee and as a member of the Nominating, Governance & ESG Committee. According to the 2023 Proxy Statement, as of June 21, 2023, Defendant Siegel beneficially owned 41,104 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 21, 2023 was $0.35, Defendant Siegel owned approximately $14,386 worth of Sunlight stock.

94.     For the 2022 Fiscal Year, Defendant Siegel received $190,000 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $125,000 in stock awards. For the 2021 Fiscal Year, Defendant Siegel received $149,160 in total compensation from the Company. This included $30,910 in fees earned or paid in cash and $118,250 in stock awards.

95.     The 2023 Proxy Statement stated the following about Defendant Siegel:

Mr. Siegel founded StoneCastle Partners, LLC in 2003 and serves as Chairman, Chief Executive Officer and Managing Partner, and previously served as Chairman of StoneCastle Financial Corp. He is widely regarded as a leading expert and investor in the banking industry. As Chief Executive Officer of StoneCastle Partners, a development company for bank-related financial services businesses, Mr. Siegel is responsible for numerous specialized products and has a discerning eye for finding innovative solutions that solve for the myriad of banking and SEC regulations that might otherwise limit our activities. During Mr. Siegel's career, his innovations have brought nearly $40 billion of capital and $25 billion of deposits to more than 1,600 community and regional banks. He was an adjunct professor at

Columbia Business School, where he lectured on imagineering in financial services. He also provides annual economic support to Prep for Prep to make sure academic brilliance is recognized and nurtured without regard to a student's economic, demographic or sociological background. Mr. Siegel received his BS in Management and Accounting from Tulane University. He is a member of the Young Presidents Organization and Mensa.

We believe Mr. Siegel is qualified to serve as a member of the Board due to his leadership experience in the banking industry.

**The Sponsor**

96.    The Sponsor, Spartan Acquisition Sponsor II LLC, a Delaware corporation formed in August 2020, served as the sponsor of Spartan leading up to the Business Combination and is affiliated with several of the Individual Defendants. The Sponsor and its affiliates collectively owned over 19% of the Company's common stock and were conflicted in the Business Combination given their investments into Spartan, which would be rendered worthless without a business combination.

97.    According to the 2023 Proxy Statement, as of June 21, 2023, the Sponsor held a total of 17,237,241 shares of Company common stock.

98.    Defendants Strong, Wilson, and Stice were the three managing members of the Sponsor at all relevant times.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

99.    By reason of their positions as officers, directors, and/or fiduciaries of Sunlight and because of their ability to control the business and corporate affairs of Sunlight, the Individual Defendants owed Sunlight and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sunlight in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to

act in furtherance of the best interests of Sunlight and its shareholders so as to benefit all shareholders equally.

100. Each director and officer of the Company owes to Sunlight and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

101. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sunlight, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

102. To discharge their duties, the officers and directors of Sunlight were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

103. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sunlight, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Sunlight's Board at all relevant times.

104.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

105.     To discharge their duties, the officers and directors of Sunlight were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sunlight were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Sunlight's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Sunlight conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Sunlight and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sunlight's operations would comply with all applicable laws and Sunlight's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

106.    Each of the Individual Defendants further owed to Sunlight and the shareholders the duty of loyalty requiring that each favor Sunlight's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

107. At all times relevant hereto, the Individual Defendants were the agents of each other and of Sunlight and were at all times acting within the course and scope of such agency.

108. Because of their advisory, executive, managerial, directorial, and controlling positions with Sunlight, each of the Individual Defendants had access to adverse, non-public information about the Company.

109. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sunlight.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

110. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

111. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

112. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance

of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Sunlight was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

113.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

114.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sunlight and was at all times acting within the course and scope of such agency.

## SUNLIGHT'S CODE OF CONDUCT

115.    Sunlight's Code of Conduct is "intended as a resource to guide the business and ethical conduct of all teammates, officers and directors of [the Company] and its direct and indirect subsidiaries." The Code of Conduct "[a]pplies to all [t]eammates, [o]fficers and [d]irectors, to [the Company's] [c]onsultants, [i]ndependent [c]ontractors [] and to the Sunlight [v]endors and [s]ervice [p]roviders."

116.    In a section titled "Sunlight is Committed to Fair Dealing in the Conduct of its Business," the Code of Conduct states the following, in relevant part:

> Sunlight is committed to acting ethically and fairly in the conduct of business. The Sunlight Team does not make disparaging or untrue statements about Sunlight competitors and does not make inaccurate or unfair comparisons between

Sunlight's competitors' technology, loan products or other aspects of their business and our own. Additionally, the Sunlight Team is committed to collecting information regarding Sunlight's competitors and the industries in which the Company operates in an ethical manner. You are prohibited from using illegal or deceptive tactics to obtain information regarding our competitors or, should you come into possession of competitor confidential information that constitutes trade secrets as defined by law, you are prohibited from sharing such information internally and from using such information to the competitive benefit of Sunlight. If you are uncertain whether or not information in your possession constitutes a trade secret, you are obligated to seek out the advice of the Legal Department prior to sharing or making use of such information. You are further prohibited from sharing with Sunlight any confidential information obtained from or relating to any of your former employers that you acquired in the course of your employment with that party, and you are obligated to inform Sunlight of any agreement you may have executed in favor of your prior employer, including restrictive covenants, such as non-compete, non-solicitation or confidentiality agreements.

117.    In a section titled, "Public Announcements and Disclosures," the Code of Conduct

states the following, in relevant part:

All members of the Sunlight Team share a responsibility to ensure that material information potentially impacting Sunlight's financial position, results of operation or business opportunities are reported on a current (timely) basis to Sunlight's Finance Department. Sunlight's Disclosure Committee, Legal Department, Finance Department, and head of business and investor relations are tasked with assisting the Company in ensuring that required disclosures are both complete and accurate and made in a timely manner.

All Sunlight Teammates are prohibited from (a) disclosing any material information relating to Sunlight unless that information has already been disclosed to the public ("material information" for purposes of the above is defined as any information that may be relevant to a reasonable investor's investment decision). The standard should be interpreted broadly (conservatively) and if you have any doubt you should confer with the General Counsel or Corporate Compliance Officer) and (b) using any such information for your own personal gain or disclosing it to any other person who may use such information for their own personal gain.

118.    In a section titled, "Sunlight Follows Fair Competition Legal Requirements," the

Code of Conduct states the following, in relevant part:

Sunlight believes in competing fairly, including by complying with all applicable fair competition laws, rules, and regulations, including antitrust laws, that prohibit certain activities like price fixing, market division, customer allocation and other

agreements in restraint of trade. If you receive any communication from a competitor that in any way suggests a combination of effort in a way that could have a restraint on trade, you should immediately discontinue the communication and report the incident to the Legal Department. If you are unsure if the communication relates to a prohibited topic, you are responsible for requesting additional guidance from Legal.

119.    Regarding "Reporting Violations," the Code of Conduct states the following:

Sunlight relies on the Sunlight Team's commitment to these values of honesty and integrity to compel teammates to make Senior Leadership aware when they note behaviors within the Company, or by our Partners or Vendors, that are contrary to these principles. We strongly encourage any teammate who becomes aware of behaviors, business decisions or other conduct that is, or may be, unethical, dishonest, improper, unlawful, or otherwise inconsistent with this Code to report such behaviors or incident to their manager, the General Counsel, Corporate Compliance Officer and/or Human Resources. If you are uncertain if a report (a "Report") is necessary, you are responsible for requesting additional guidance from your manager or Human Resources. Employees that are aware of conduct that is unethical or illegal or that violates our Code or the Company's other policies and procedures are required to report such behavior. This requirement to report extends to the behaviors, business decisions or other conduct of our Partners and Vendors. The failure to report a known breach will in-itself be viewed as a material violation of this Code and of Sunlight's Core Value of honesty.

120.    In a section titled, "Avoiding Conflicts of Interest is Central to Making Unbiased Business Decisions," the Code of Conduct states the following, in relevant part:

A "conflict of interest" arises when your personal interests compromise your ability to make fair and unbiased decisions in your role at Sunlight. Teammates must not place themselves in situations that create, or appear to create, a conflict of interest. Senior Leadership, the Sunlight Team as a whole, Sunlight's Partners and Vendors must all feel confident that business decisions made by teammates are uncompromised by personal interests that may differ from the interests of the Company. Teammates who find they do have a conflict of interest or could be perceived as having a conflict of interest should inform Human Resources immediately. Sunlight will consider alternatives to alleviate any potential negative repercussions or concerns for repercussions, which may include altering the teammates responsibilities. For more information, see the "Employment at the Company" Section of Sunlight's Teammate Handbook.

121.    In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's

engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## SUNLIGHT'S AUDIT COMMITTEE CHARTER

122. The Company also maintains an Audit Committee Charter (the "Charter"). Regarding the Company's annual Forms 10-K and quarterly Forms 10-Q, the Charter states that: "[t]he Committee shall review and discuss the following with management and the Independent Auditor, as applicable: [t]he Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in 'Management's Discussion and Analysis of Financial Condition and Results of Operations.'"

123. Moreover, with respect to the Company's earnings press releases, the Charter provides that "[t]he Committee shall review and discuss with management earnings press releases (with particular attention to any use of non-GAAP financial measures), as well as financial information and earnings guidance provided to the public, analysts and ratings agencies."

124. On the topic of "Risks," the Charter states that "[t]he Committee shall review and discuss with management, the internal auditor and the Independent Auditor the Company's major risk exposures including financial reporting, tax, legal, regulatory compliance, accounting, disclosure controls and procedures and internal control over financial reporting."

125. Finally, with respect to the Company's internal control over financial reporting and disclosure controls and procedures," the Charter provides that "[t]he Committee shall meet to

review and discuss the following with management and the Independent Auditor, as applicable: the reports and certifications regarding internal control over financial reporting and disclosure controls and procedures."

126. In violation of the Charter, Defendants Huynh, Ryan, and Siegel failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT**

**Relevant Background**

*The History of Legacy Sunlight*

127. Legacy Sunlight operated as a business-to-business-to-consumer POS financing platform that partnered with contractors nationwide to provide homeowners with financing for the installation of residential solar systems and other home improvements. Upon the completion of the Business Combination, the Company undertook Legacy Sunlight's business operations.

128. Sunlight does not advertise directly to homeowners, instead choosing to rely on contractors to inform customers about Sunlight's financing options. As a result, in order for the Company to generate revenue, it needs to persuade as many contractors as possible to use the Company's financing platform when signing up customers. Notably, the agreements Sunlight enters into with its contractors are not exclusive, meaning that a contractor in the Company's network is not required to use the Company's financing platform and instead may use the platforms of any of the Company's competitors when providing financing options to customers.

129. To distinguish itself from its competitors, Legacy Sunlight implemented a cash advance program for its contractors, whereby Legacy Sunlight provided a subset of its contractors

with advance funding prior to the contractors installing the company's systems. In other words, Legacy Sunlight's program gave money to contractors before any work was started. The structure of the program proved unique, as typically, companies financing home improvements do not pay contracts until projects are completed, instead forcing contractors to shoulder significant costs up-front before they receive funding. Upon completion of the Business Combination, Sunlight took on these business operations and continued to operate the cash advance program for Company contractors.

130.    Prior to and following the Business Combination, the Company represented to investors that the unique structure of Legacy Sunlight's (and later, the Company's) cash advance program was a major draw for contractors when deciding which company to partner with for customer financing and thus made Sunlight a more desirable pursuit than its competitors. Similarly, on a conference call to discuss the Company's financial results for Fiscal Year 2021, Defendant Potere represented to investors that the Company's cash advance program was a "highly effective" tool to develop relationships with new and existing contractors, and that the Company's choice in 2021 to provide companies with even more robust cash advances was a "material factor in signing significant contractor commitments for 2022."

131.    Despite these promising assertions, in reality, the cash advance program put Legacy Sunlight (and later, the Company) at great risk. Although beneficial for contractors, Legacy Sunlight's cash advance program opened Legacy Sunlight (and later, the Company) up to substantial credit risk. However, throughout the Relevant Period, Defendants concealed this reality from investors.

**The History of Spartan**

132.     Spartan was founded in 2020 by Apollo Global and operated as a SPAC, a publicly traded corporation with a two-year life span formed with the sole purpose of effecting a merger with a privately held business to enable it to go public. Spartan had no business operations of its own and instead was formed exclusively for the purpose of acquiring an existing operating business. The operating company benefits from the business combination by getting access to investment without undergoing the strictures of a formal IPO, and the SPAC and its shareholders benefit by having (ideally) more valuable shares from combining with a valuable target company.

133.     Before Spartan's initial public offering ("IPO"), Apollo Global caused one of its affiliates, the Sponsor, to purchase the 8,625,000 Founder Shares at nominal consideration. Through the issuance of the Founder Shares, the Sponsor, its affiliates, and the Sponsor's directors and officers collectively owned approximately 20% of Spartan's issued and outstanding shares of common stock after Spartan's IPO.

134.     On October 9, 2020, Spartan filed its initial registration form with the SEC on Form S-1 (the "Form S-1"). At the time, Defendant Strong sat on Spartan's Board of Directors, and Defendants Wassenaar, Handler, Hommes, Romeo, Wilson, and Stice were all director nominees. The Form S-1 represented that Spartan's "initial stockholders will continue to exert control at least until the completion of [Spartan's] business combination." Spartan defined its "initial stockholders" to mean its "holders of [Spartan] founder shares prior to this offering." The Form S-1 also disclosed that, prior to Spartan's IPO, the holders of the Founder Shares included the Sponsor, Defendant Wilson, and Defendant Stice, and that Defendant Strong may also be determined to have or share beneficial ownership of the Founder Shares. The Form S-1 was signed by Defendant Strong, in his capacity as Spartan's CEO, and Defendant Crossen, in his capacity as Spartan's CFO and Chief Accounting Officer.

*The Individual Defendants Wanted the Business Combination to Close to Profit Off Of Their Investments*

135. On November 30, 2020, Spartan closed its IPO, selling 34,500,000 units and generating gross proceeds of approximately $345 million. In addition, Spartan issued warrants to the Sponsor in a private placement that occurred simultaneously with the closing of the IPO. Specifically, the Sponsor purchased the 9,900,000 Private Placement Warrants at a price of $1.00 per private placement warrant, for a purchase price of $9,900,000.

136. Following the closing of Spartan's IPO, $345 million of the net proceeds generated from the IPO and simultaneous private placement were placed in the Trust, and these funds were to be released only upon the closing of a qualifying business combination, or in the case of liquidation to return the funds to Spartan's investors.

137. Prior to its IPO, Spartan represented in its Form S-1 filed with the SEC that it would be forced to "redeem 100% of our public shares if we have not consummated an initial business combination within 24 months from the closing of [the IPO]." This meant that, in the event Spartan failed to complete a business combination by that time, Spartan would have had to: (1) cease all its operations, except those made for the purpose of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to Spartan's investors.

138. Because each of Spartan's officers and directors agreed to waive their rights to liquidating distributions from the Trust, the $345 million Founder Shares and Private Placement Warrants would have been rendered worthless to them in the event Spartan failed to timely complete a business combination.

139. Apollo Global was also motivated to effectuate a merger of Spartan, as it had deep financial interests in Spartan and the Sponsor and knew that it would miss out on windfalls from

the Trust if Spartan did not effectuate a Business Combination by the deadline. As a result, Apollo Global packed Spartan's Board with individuals loyal to Apollo Global. Five of Spartan's seven directors were deeply involved with Apollo Global, with all of them (i.e., Defendants Strong, Crossen, Wassenaar, Handler, Hommes, and Romeo) working for either Apollo Global or other of its related entities.

140. Notably, Apollo Global also chose to fill the last two Spartan board seats with two directors from its previous SPAC, Defendants Wilson and Stice, effectively ensuring their loyalty to Apollo Global and its interests. Apollo Global also provided Defendants Wilson and Stice with 50,000 Founder Shares each which would leave each of them with a significant windfall of approximately $500,000 if the Business Combination closed by Spartan's deadline (and, conversely, with nothing in the event that the Business Combination failed to reach completion).

141. As a result, Apollo Global caused the entire Spartan Board to have conflicts of interest in the Business Combination.

***Commencement of Business Combination Discussions***

142. On January 23, 2021, Legacy Sunlight and Spartan entered into the Merger Agreement. Pursuant to the terms of the Merger Agreement, the Legacy Sunlight Defendants were required to ensure that certain Spartan SEC filings pertaining to the Business Combination were accurate. In relevant part, the Merger Agreement stated:

> [Legacy Sunlight] and its legal counsel shall be given reasonable opportunity to review and comment on the Proxy Statement/Prospectus and Registration Statement prior to the filing thereof with the SEC and [Spartan] shall give reasonable consideration to any such comments.
>
>                \* \* \*
>
> Each of [Spartan and Legacy Sunlight]: (A) shall use its commercially reasonable efforts to respond promptly to any comments of the SEC or its staff with respect to the Proxy Statement/Prospectus and Registration Statement; and (B) to the extent required by the applicable requirements of United States securities Laws and the rules and regulations of the SEC promulgated thereunder, shall use its

commercially reasonable efforts to promptly correct any information provided by it for use in the Proxy Statement/Prospectus and Registration Statement to the extent such information shall be or shall have become false or misleading in any material respect.

\* \* \*

*[Legacy Sunlight] represents that the information supplied by [Legacy Sunlight]* for inclusion in the Registration Statement and the Proxy Statement/Prospectus *shall not . . . contain any untrue statement of a material fact or fail to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.*

(Emphasis added.)

143. The Merger Agreement also noted that, if, prior to the completion of the Business Combination, Legacy Sunlight were to discover any information "that is required to be set forth in an amendment or a supplement to the Registration Statement or the Proxy Statement/Prospectus by the applicable requirements of the Securities Act . . . or the Exchange Act and the rules and regulations thereunder, [Legacy Sunlight] shall promptly inform [Spartan]."

144. On January 25, 2021, Legacy Sunlight and Spartan announced to the investing public in a joint press release that they were merging, with the Company forming from the Business Combination to be called Sunlight Financial Holdings Inc. Legacy Sunlight would continue as a wholly-owned subsidiary of the Company, and Legacy Sunlight's existing management team would lead the Company. Defendants Bernstein, Gorgas, Henry, Huynh, Nordquist, Potere, Ryan, Shea, and Siegel were appointed to serve as directors on the Board following the close of the Business Combination.

### Prior to the Completion of the Business Combination, Spartan Fails to Conduct Due Diligence of Legacy Sunlight

145. Between January 2021 and July 2021, Spartan and its advisors repeatedly represented to investors that they had conducted due diligence of Legacy Sunlight in anticipation of the proposed Business Combination. Indeed, the Merger Proxy Statement represented that, on

December 14, 2020, "[a]fter reviewing relevant information about [Legacy] Sunlight, including its business plan, the merits of a business combination and the results of Spartan's representatives' due diligence, the Spartan Board expressed support for pursuing the transaction with Spartan and instructed Spartan's representatives to continue with the negotiations and to enter into a non-binding letter of intent ['LOI']."

146.    The Merger Proxy Statement also represented that Spartan's Board of Directors decided to pursue the Business Combination with Legacy Sunlight over other possible acquisitions because of, among other things:

> The determination of Spartan's management and [the Sponsor] that [Legacy Sunlight] had a competitive differentiation over its industry peers and other potential acquisitions

> The other potential acquisitions did not fully meet the investment criteria of Spartan, which included, among other things, candidates that (i) are at an inflection point, (ii) exhibit strong growth overseen by a highly-experienced management team, and (iii) would additionally benefit from Spartan's management's transactional, financial, managerial and investment experience and

> a difference in valuation expectations between Spartan and the senior executives or stockholders of the other potential acquisition candidates.

147.    In reality, Spartan's due diligence of Legacy Sunlight was glaringly inadequate, as it unreasonably failed to: (1) investigate and confirm Legacy Sunlight's claims about having a "low risk" cash advance program for its contractors; or (2) investigate the supply chain concerns impacting the entire solar industry, including Legacy Sunlight (discussed in more detail below).

148.    On or around December 27, 2020, Spartan's Board allegedly discussed with its counsel how advisable it would be to form a transaction committee, consisting entirely of disinterested and independent directors of Spartan's Board, in order to investigate the potential related party transaction involving one or more affiliates of the Sponsor or Apollo Global (the "Potential Related Party Transaction").

149.     On January 8, 2021, Spartan's Board established a transaction committee (the "Transaction Committee"), whose members included Defendants Stice and Wilson, for the purpose of investigating the Potential Related Party Transaction. The Transaction Committee was provided with the authority to explore and consider the potential Business Combination and the Potential Related Party Transaction, including the authority to make any recommendations regarding the Business Combination and the Potential Related Party Transaction to Spartan's Board.

150.     However, Spartan's Board notably did not provide the Transaction Committee with the full responsibilities usually given to special committees in conflicted transactions (i.e., negotiating the terms of a merger agreement, deciding whether to enter into a merger agreement, approving a merger agreement, etc.). Instead, the Transaction Committee was provided with the limited responsibility of deciding whether the Business Combination, or any other potential business combinations contemplated by Spartan's Board, would implicate a Potential Related Party Transaction.

151.     By the time Spartan's Board had entered into the Merger Agreement, it had also not obtained a third-party valuation or fairness opinion of Legacy Sunlight. Instead, the Spartan Defendants repeatedly represented to stockholders that they could rely on the Spartan Board's business experience in deciding to enter the Business Combination with Legacy Sunlight. Indeed, the Spartan Board noted in the Merger Proxy Statement that it had "substantial experience in evaluating the operating and financial merits of companies from a wide range of industries and conclude that their experience and backgrounds, together with the experience and sector expertise of Spartan's advisors, enabled them to make the necessary analyses and determinations regarding the Business Combination."

*Supply Chain Concerns Surrounding Legacy Sunlight and Later, the Company*

152.    Leading up to the Business Combination, the Individual Defendants repeatedly touted Legacy Sunlight's business prospects and the overall demand for the solar industry, representing to investors that the "cost for equipment itself" was getting cheaper, making solar energy "less expensive on an absolute basis."

153.    However, these statements about solar equipment becoming cheaper had no rational basis, which Spartan and the Spartan Defendants would have discovered had they performed adequate due diligence of Legacy Sunlight prior to the completion of the Business Combination. The truth was that the prices of solar panels were rising due to persistent supply chain issues plaguing the entire solar industry.

154.    For example, a March 2021 article titled "Solar Panels: Polysilicon Price Pressure Persists," revealed that "[the prices of] solar panels have risen significantly in China since the second quarter of last year due to the tight supply of not only polysilicon, but also glass, silver and module frames." Polysilicon is one of the main materials used to build solar panels, and several of the Company's SEC filings acknowledge that "certain silica-based products, such as polysilicon . . . [are] used by manufacturers of solar panels . . . ." The March 2021 article also noted that "[s]olar cell and panel manufacturers don't operate on huge margins, so upstream pricing pressure is being passed down to buyers."

155.    A separate article published on March 18, 2021 similarly reported on how "Australia's solar market could be hit by a panel price shock as early as next month . . . as global price increases driven by a prolonged shortage of polysilicon and other materials start to catch up with the local market."[2]

---

[2]    https://reneweconomy.com.au/australia-braces-for-solar-price-hike-as-supply-chain-pressures-

156.    On April 28, 2021, PVTECH published an article which revealed that "material and component shortages have emerged since the end of last year as perhaps *the defining feature of the global solar industry*, with *polysilicon shortages sending the cost of solar modules up by as much as 25%* over the past six months."[3] (Emphasis added.)

157.    On June 9, 2021, Reuters published a similar article titled "Focus: Global supply chain squeeze, soaring costs threaten solar energy boom" which revealed that "[g]lobal solar power developers are slowing down project installations because of a surge in costs for components, labor, and freight as the world economy bounces back from the coronavirus pandemic."[4] The Reuters article also noted that one of "the biggest headwinds for solar" was a "tripling in prices for steel, a key component in racks that hold solar panels, and polysilicon, the raw material used in panels." In addition, Reuters reported that "[s]oaring shipping freight rates along with higher costs for fuel, copper and labor are also pinching project costs."

158.    Still, these truths were concealed from investors throughout the False and Misleading Supply Chain Period, with the Individual Defendants instead focused on effectuating the Business Combination and reaping the monetary windfalls therefrom.

**The Overpayment Misconduct**

***The Business Combination***

159.    On July 6, 2021, the Redemption Right expired and was exercised for 19,227,063 shares.

---

start-to-bite/
[3]        https://www.pv-tech.org/enphase-beats-q1-guidance-but-semiconductor-shortages-weigh-heavy-on-forecasts/
[4]    https://www.reuters.com/business/sustainable-business/global-supply-chain-squeeze-soaring-costs-threaten-solar-energy-boom-2021-06-09/

160. On July 8, 2021, Spartan's shareholders approved the Business Combination, which closed the following day, July 9, 2021.

161. On July 12, 2021, the Company began trading on the NYSE.

162. Upon completion of the Business Combination, the Sponsor's 8,625,000 founder shares were converted into 8,625,000 publicly-traded shares, worth $86,250,000 at the IPO price.

163. Per the terms of the Business Combination, Legacy Sunlight's former shareholders would receive approximately 50% ownership of the Company, while Spartan's shareholders would receive only 26% ownership.

164. These terms were unfavorable and unreasonable to Spartan shareholders, given that Legacy Sunlight was a less valuable acquisition than Spartan shareholders were led to believe.

**Business Combination Closes as Company Continues to Face Challenges**

***Continuing Problems Regarding Vetting and Monitoring Contractors***

165. Following the completion of the Business Combination, the Company now faced the same challenges with the contractor advance program that had previously plagued Legacy Sunlight–but that had notably been concealed from investors leading up to the Business Combination.

166. Several former Company employees were interviewed by plaintiffs' counsel in the Securities Class Action. One former employee working at the Company between December 2017 to March 2022 was interviewed by plaintiffs' counsel in the Securities Class Action and identified therein as "CW1." CW1, who worked as a Senior Relationship Manager at the Company and handled all elements of the Company's relationships with solar system contractors, represented that Sunlight's due diligence on contractors was "lackadaisical." CW1 further noted that the Company's initial vetting of contractors involved reviewing the contractors' self-supplied

financial statements. CW1 also described how, notably, after a contractor has been accepted into the Company's network, the Company provides no "ongoing monitoring" of the contractor aside from an annual review of the contractor's self-supplied financial statements. The Company performed no other due diligence of its contractors prior to providing them with substantial cash advances.

167.    While employed by Legacy Sunlight, CW1 also observed that, beginning in late 2019, Legacy Sunlight accepted any contractor willing to work with it, noting that Legacy Sunlight "accepted everyone until they got screwed" and that "[o]nce they got screwed, they would cut ties with [the contractor]."

168.    Another former employee working at the Company between October 2021 and October 2022 was interviewed by plaintiffs' counsel in the Securities Class Action and identified therein as "CW2." CW2's responsibilities at the Company included finding contractors to work with Sunlight and growing the accounts. CW2 noted how the Company was spending substantial amounts on its cash advances to contractors to receive "first look" agreements. "First look" agreements involve a contractor agreeing to tell a customer about the Company's financing platforms first before showing those of any Company competitors.

169.    CW2 represented that the cash advance program for contractors established a broken system where Sunlight would be forced to continue providing cash advances to troubled contractors as a way to ensure the contractors could complete their projects. Regarding the due diligence and ongoing monitoring of contractors Sunlight claimed it was performing, CW2 stated that "it's never executed."

***Because of Its Deficient Contractor Vetting and Monitoring, The Company Failed to Discover the Problems Plaguing Pink Energy***

170. On August 15, 2022, Sunlight filed its quarterly report on Form 10-Q with the SEC for the second quarterly period ended June 30, 2022 (the "2Q22 10-Q"). The cash advance amounts disclosed in the 2Q22 10-Q revealed that the Company assigned Pink Energy a risk rating of "3" on a 1-5 scale (with 1 being the least risky and 5 being the most risky). In the 2Q22 10-Q, the Company represented that a risk rating of 3 indicates that the contractor has "medium commercial credit risk, ***excellent to average reputational risk*** (e.g., online ratings, average complaint levels) and/or an ***excellent to average risk assessment***." (Emphasis added.)

171. Because Sunlight failed to conduct a "reputational review" of Pink Energy, Sunlight continued to advance cash payments to Pink Energy even though, by early 2022, due diligence would have informed Sunlight that Pink Energy was suffering severe operational problems and thus, the Company's representations to investors that Pink Energy's reputational risk and risk assessment were "excellent to average" had no rational basis.

172. Had Sunlight performed adequate due diligence of its contractors, it would have discovered that, by spring 2022, various complaints had been made about Pink Energy's shoddy workmanship and deceptive salespeople. Indeed, according to a WECT News article, in Ohio alone, the Attorney General received 57 complaints against Pink Energy in 2021 and 2022 alleging deceptive sales practices. Similarly, a FOX2 Detroit article from April 2022 reported about a Pink Energy salesperson lying to customers about federal tax refunds they could receive if they installed solar panels. The article also reported on lawsuits filed against Sunlight and on other instances of residents in the Detroit area being deceived by Pink Energy salespersons.

173. Additionally, between 2021 and 2022, Pink Energy's financial condition, business operations, and reputation were negatively impacted by a legal battle Pink Energy was facing with

one of its suppliers. The supplier created an electrical component for Pink Energy's solar panels which, among other things, was alleged to be a fire hazard and defective.

174.     The suit further revealed that Pink Energy began to receive "an overwhelming number of negative reviews and complaints to the Better Business Bureau, social media, and other public platforms" which severely tarnished its reputation. Additionally, because of the reputational damage Pink Energy faced due to its faulty electrical components and resulting customer complaints, the company began experiencing a significant increase in its number of customer cancellations, causing Pink Energy to lose $155 million in lost revenue. Moreover, from September 2021 to June 2022, Pink Energy's valuation plummeted more than 50%.

175.     The issues plaguing Pink Energy would have been apparent to Sunlight had it performed the substantial due diligence and monitoring of its contractors that it repeatedly told investors it did. Instead, because Sunlight failed to adequately vet and monitor its contractors prior to providing them significant cash advances, it misleadingly characterized to investors that Pink Energy was a "3" risk level, having "excellent to average" reputational risk and risk assessment.

176.     The Company's failure to conduct due diligence and monitoring of its contractors was also made apparent when, amid the ongoing problems at Pink Energy, Defendant Yoder represented to investors on an August 15, 2022 earnings call that Sunlight "expect[ed] losses in the future to remain very low" with regard to cash advances Sunlight made to its contractors. That Sunlight was blind to Pink Energy's troubles was particularly alarming due to the fact that the cash advances the Company provided to Pink Energy far exceeded those Sunlight offered to other contractors. Indeed, Pink Energy had more than three times the amount of advances received compared to Sunlight's next-largest advances recipient as of September 28, 2022.

**Because Sunlight Failed to Vet and Monitor Its Contractors, The Cash Advance Program Was Not "Low Risk" To Sunlight**

177.    Despite Defendants' repeated representations throughout the Relevant Period that the cash advance program was "low risk" to Sunlight (discussed in more detail below), the program actually created significant risks for Sunlight since there were no proper procedures in place to vet or monitor contractors.

178.    In particular, the cash advance program made the Company vulnerable to providing contractors more in cash advances than what the Company was receiving as income. Indeed, by the end of fiscal year 2020, the Company had $35 million in cash advances outstanding despite only reporting net income of $10 million.

179.    The risks of the program had worsened for Sunlight by 2022. At the time the Company filed the 2Q22 10-Q, Sunlight had $91 million in cash advances outstanding. Notably, that was more than the total amount of cash that Sunlight had in hand (i.e. $68 million) and more than three times Sunlight's revenue for that quarter (i.e. $29 million). Because of the Company's deficient process for vetting and monitoring of contractors that it gave advances to, these large advances posed significant risk to Sunlight in the event of default.

180.    On the news that Sunlight was impairing the advances receivable from Pink Energy due to the latter's imminent bankruptcy, Sunlight's stock price dropped by 57%, wiping out more than half of the Company's market capitalization. Despite the importance of the cash advance program in differentiating Sunlight from its competitors and the significant role that it played in attracting contractors to work with Sunlight, Sunlight first reduced advances and then suspended the program in the aftermath of the Pink Energy default.

181.    Indeed, on an earnings call in early 2023, Defendant Potere admitted that the cash advance program was risky to Sunlight, telling analysts that in the fourth quarter of 2022 the

Company took steps to "mitigate our risk" in the cash advance program, and then decided to "suspend the program indefinitely" as of March 2023.

182.    The Company would not have taken these actions if the cash advances were truly low risk, especially since these advances were touted as one of the key factors in Sunlight's ability to recruit contractors to work with the Company.

**False and Misleading Statements**

**The False and Misleading Supply Chain Period**

***January 25, 2021 Form 8-K***

183.    On January 25, 2021, Spartan filed a current report with the SEC on Form 8-K, which Defendant Strong also signed in his capacity as Spartan's CEO. The Form 8-K attached an interview transcript which quotes Defendant Potere as alleging that "consumers now convert to solar for sound economic reasons," including that "the ***cost of solar is reducing on an absolute basis***."

184.    The statements in ¶ 183 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the entire solar industry was facing severe supply chain issues, labor delays, and shortages; (2) due to these widespread issues, the costs of the materials needed to build solar panels were rapidly increasing; and (3) as a result, the Company had experienced a "margin decrease" that was harming the Company. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

***February 25, 2021 SEC Filing***

185.    On February 25, 2021, Spartan filed an interview transcript with the SEC dated February 11, 2021. During the interview, Defendant Potere made various representations touting the low costs of the solar industry. When asked about "the cost of solar coming down" and "growth

in the solar industry in a company like [Legacy] Sunlight," Defendant Potere responded that "there's really two interesting trends that are happening and that are helping to drive solar," one of which is "[t]he cost for equipment itself is getting cheaper. And that makes solar less expensive on an absolute basis."

186.     The Form 8-K attached an interview transcript which quotes Defendant Potere as alleging that "consumers now convert to solar for sound economic reasons," including that "the ***cost of solar is reducing on an absolute basis***." (Emphasis added.)

187.     The statements in ¶ 185-186 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the entire solar industry was facing severe supply chain issues, labor delays, and shortages; (2) due to these widespread issues, the costs of the materials needed to build solar panels were rapidly increasing; and (3) as a result, the Company had experienced a "margin decrease" that was harming the Company. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

### March 24, 2021 Investor Presentation

188.     On March 24, 2021, Spartan filed a Legacy Sunlight investor presentation with the SEC attached to a Form 425. In the filing, Spartan described the slideshow as "presentation materials [that] were used by [Legacy Sunlight] in a presentation to analysts made on March 24, 2021." The slideshow, which featured Defendants Potere and Edinburg as "Today's Speakers," represented to analysts that the "[r]paid decline in costs" the solar industry was experiencing stood to benefit Legacy Sunlight. In relevant part, the slideshow represented:



189. The statements in ¶ 188 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the entire solar industry was facing severe supply chain issues, labor delays, and shortages; (2) due to these widespread issues, the costs of the materials needed to build solar panels were rapidly increasing; and (3) as a result, the Company had experienced a "margin decrease" that was harming the Company. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

*April 13, 2021 Investor Presentation*

190. On April 13, 2021, Spartan filed a Legacy Sunlight investor presentation with the SEC attached to a Form 425 and Form 8-K. Defendant Strong, in his capacity as Spartan's CEO, signed the Form 8-K which attached the slideshow. Spartan described the slideshow as

"presentation materials [that] were used by [Legacy Sunlight] in various presentations made to stockholders of Spartan [] in April 2021." The slideshow, which featured Defendants Potere and Edinburg as "Today's Speakers," represented to analysts that the "[r]paid decline in costs" the solar industry was experiencing stood to benefit Legacy Sunlight and contained substantially the same false and misleading statements and representations as those contained in ¶ 188 above.

191.    The statements in ¶ 190 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the entire solar industry was facing severe supply chain issues, labor delays, and shortages; (2) due to these widespread issues, the costs of the materials needed to build solar panels were rapidly increasing; and (3) as a result, the Company had experienced a "margin decrease" that was harming the Company. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

## The Truth Emerges Regarding the Widespread Supply Chain Issues

192.    On August 16, 2021, approximately one month after the Business Combination was completed, the Company hosted an earnings call. During the call, Defendants Edinburg and Potere discussed previously undisclosed issues that had plagued Legacy Sunlight and were now plaguing the Company. Defendants Edinburg and Potere also disclosed that the solar industry in general was experiencing significant supply chain issues, delays, and labor shortages. In particular, Defendant Edinburg further revealed that the Company had experienced a "margin decrease" that was severely harming it.

193.    On this news, the Company's stock price fell $1.97, from a closing price of $7.44 per share on August 16, 2021 to close at $5.47 per share on August 17, 2021.

**False and Misleading Advance Program Period**

*January 25, 2021 Presentation and Transcript*

194.     On January 25, 2021, Defendants Strong, Potere, and Edinburg hosted a conference call with investors regarding the proposed business combination. The transcript of the call was filed with the SEC on the same day. During the presentation, Defendant Potere stated, in relevant part:

> ***We structure these advances such that they're low risk to Sunlight, but provide significant benefit to our contractors.*** This is another example of how at Sunlight we use credit experience and access to capital to differentiate our value proposition.

(Emphasis added.)

195.     Defendant Potere's statements were made in the context of the proposed Business Combination and were related to and about Spartan and the post-Business Combination Sunlight. Notably, during the call, Defendant Strong—at that time, Spartan's CEO—stated that "we are excited to announce this morning that Spartan is combining with Sunlight Financial…and bringing it to the public markets." Defendant Potere's statements related to both Spartan and post-Business Combination Sunlight, as Spartan had no business operations of its own, and its business post-Business Combination was that of Legacy Sunlight's. The conference call was designed to influence both Spartan investors and those interested in the post-Business Combination Sunlight.

196.     The statements in ¶ 194 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge

exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

### March 22, 2021 Registration Statement

197.    On March 22, 2021, Spartan filed a registration statement and preliminary proxy statement and prospectus on Form S-4 with the SEC in connection with the Business Combination (the "Registration Statement"). The Registration Statement was signed by Defendants Strong, Crossen, Wassenaar, Handler, Hommes, and Romeo.

198.    The Registration Statement represented that "Sunlight has adopted vigorous contractor diligence and monitoring procedures." The Registration Statement stated the following, in relevant part:

> Upon the engagement of a contractor into Sunlight's network, ***Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation***, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.
> 
> ***
> 
> ***Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition*** (to support construction processes and provide post construction warranty support) ***and legal compliance practices of the contractors in Sunlight's network.***

(Emphasis added.)

199.    The statements in ¶ 198 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading.

Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

### *May 12, 2021 Amendment*

200.    On May 12, 2021, Spartan filed an amendment to the Registration Statement with the SEC, which was signed by Defendants Strong, Crossen, Wassenaar, Handler, Hommes, and Romeo. The amended Registration Statement stated the following, in relevant part:

> Upon the engagement of a contractor into Sunlight's network, ***Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation***, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.
>
> ***
>
> ***Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition*** (to support construction processes and provide post construction warranty support) ***and legal compliance practices of the contractors in Sunlight's network.***

(Emphasis added.)

201.     The statements in ¶ 200 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

### June 1, 2021 Amendment

202.     On June 1, 2021, Spartan filed a second amendment to the Registration Statement with the SEC, which was signed by Defendants Strong, Crossen, Wassenaar, Handler, Hommes, and Romeo. The amended Registration Statement stated the following, in relevant part:

> Upon the engagement of a contractor into Sunlight's network, ***Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation***, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.
> 
> \*\*\*
> 
> ***Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition*** (to support construction processes and provide post construction warranty support) ***and legal compliance practices of the contractors in Sunlight's network.***

(Emphasis added.)

203.     The statements in ¶ 202 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

### June 21, 2021 Proxy Statement and Prospectus

204.     On June 21, 2021, the Company filed the Merger Proxy Statement with the SEC in connection with the Business Combination. The Merger Proxy Statement was solicited by Defendant Strong, Handler, Hommes, Romeo, Stice, Wassenaar, and Wilson pursuant to Section 14(a) of the Exchange Act. Defendant Strong also signed the Merger Proxy Statement, which contained materially misleading elements.

205.     The Merger Proxy Statement requested Company shareholders to vote to, *inter alia*, approve numerous proposals necessary to effectuate the Business Combination; elect Defendants Bernstein, Gorgas, Henry, Huynh, Nordquist, Potere, Ryan, Shea, and Siegel to Sunlight's Board; approve, for purposes of complying with applicable listing rules of the NYSE, the issuance of an aggregate of 115,000,000 shares of Class A Common Stock and an aggregate of 50,000,000 shares of Class C Common Stock in connection with the Business Combination (the "NYSE Proposal");

and approve the 2021 Equity Incentive Plan (the "Plan") under which certain Individual Defendants would be eligible to receive material benefits (the "2021 Proposals").

206.    The purpose of the Plan was "to attract, retain, incentivize and reward employees, non-employee directors and other service providers who will contribute to the post-combination company's success."

207.    Pursuant to the Plan, awards may be granted until the tenth anniversary of the Plan's effective date, which is July 9, 2031, unless the 2021 Plan Administrator (either the Board or one of the committees it delegates) terminates the Plan before then. Further, the Plan includes an annual limit for each non-employee director's total compensation. Under the Plan, the grant date fair value of shares of common stock subject to any award granted to a non-employee director in any calendar year may not exceed $500,000.

208.    The Merger Proxy Statement represented that Legacy Sunlight had "adopted vigorous contractor diligence and monitoring procedures." Regarding Risk Management, it further stated the following, in relevant part:

> Upon the engagement of a contractor into Sunlight's network, ***Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation***, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.
>
> * * *
>
> ***Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition*** (to support construction processes and provide

post construction warranty support) ***and legal compliance practices of the contractors in Sunlight's network.***

(Emphasis added.)

209.    The Merger Proxy Statement also represented to investors that the following reasons supported Spartan's Board's decision to enter the Merger Agreement and recommend the Business Combination:

> *Competitive Positioning*. The Spartan Board noted that Sunlight has a best-in-class user experience with a strong customer interface. The Spartan Board considered the proprietary technology that Sunlight has developed, which aids its contractors and customers due to the platform's clean user interface and capability to provide efficient credit approvals. The Spartan Board also noted Sunlight's impressive growth, including its customer growth and rapid volume growth profile based on the amount of its funded loans in the past several years.
>
> \* \* \*
>
> *Sunlight's Asset Light Business Model*. The Spartan Board considered Sunlight's flexible business model and noted that its asset-light funding model results in high operating leverage and ***minimal risk retention***, as well as minimal capex required to expand its customer base.

(Emphasis added.)

210.    The statements in ¶¶ 208-209 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

211. Under the section titled "The Spartan Board's Reason for the Approval of the Business Combination," the Merger Proxy Statement stated that "the Spartan Board reviewed the results of the due diligence conducted by Spartan's management and Spartan's advisors," including:

- meetings and calls with Sunlight's management regarding business model, operations and forecasts;

- legal and regulatory due diligence review conducted by various legal advisors which included, among other things, a review of material contracts, including with respect to capital providers, channel partners and vendors, intellectual property matters, regulatory matters and other legal documents posted to a virtual data room, conference calls with Sunlight and its attorneys and certain public record searches;

- financial, tax and accounting due diligence;

- commercial and market due diligence;

- consultation with legal and financial advisors and industry experts;

- research on comparable public companies;

- financial and valuation analysis of Sunlight and the Business Combination; and

- the financial statements of Sunlight.

212. Regarding the due diligence the Spartan Board took with respect to investigating Legacy Sunlight prior to the completion of the Business Combination, the Merger Proxy Statement also represented:

*Independent Director Role.* Spartan's independent directors took an active role, together with Spartan management, as Spartan evaluated and negotiated the proposed terms of the Business Combination. Following an active and detailed evaluation, the Spartan Board's independent directors unanimously approved, as members of the Spartan Board, the Business Combination Agreement and the Business Combination.

213. The statements referenced in ¶¶ 211-212 above were materially false and misleading because Spartan misrepresented its due diligence efforts of Legacy Sunlight by

exaggerating that it had conducted proper due diligence of Legacy Sunlight prior to completion of the Business Combination.

214.    The Merger Proxy Statement also misrepresented the value of Spartan shares leading up to the Business Combination by representing that each Spartan share was worth $10.00. In particular, the Merger Proxy Statement provided the following consideration calculation that valued each Spartan share at $10.00:

> "Total Equity Consideration" are to Class A Common Stock and Sunlight Class EX Units (and a corresponding number of shares of Class C Common Stock), which aggregate number of shares of Class A Common Stock and Sunlight Class EX Units will be equal to the quotient of (a) the excess of (x) $1,175,000,000 over (y) the Total Cash Consideration, and (b) $10.00
>
> * * *
>
> Following the meeting of the Spartan Board, on December 14, 2020, Spartan and Sunlight entered into a confidentiality agreement and a confidential, non-binding letter of intent, providing for: . . . . the conversion of all outstanding equity interests of Sunlight into shares of Class A Common Stock based on a ratio equal to a pre-money equity value of $1.175 billion divided by $10.00

215.    The statements referenced in ¶ 214 above were materially false and misleading because Spartan actually had much less cash per share and total cash such that there was less than $8.00 in net cash underlying those shares. Upon accounting for the Founder Shares for entities associated with matching Spartan and Legacy Sunlight together, and warrants included in units purchased by the Sponsor in the IPO, among other transactions, the actual net cash behind each share held by Spartan shareholders before the Business Combination was less than $8.00 – meaning the value of any investment they made into the new Company would also be worth that amount. Spartan's cash, its only asset, was diluted through the issuance of shares and warrants, and was further impacted by fees paid to accomplish the Business Combination. The financial impact of such events would also be aggravated by shareholder redemptions. These facts were not sufficiently disclosed in the Merger Proxy Statement. The implications of this included that the

post-Business Combination Company would have less cash on hand than shareholders expected and the Company would be less valuable. In truth, the value of Legacy Sunlight's shares was inflated. Consequently, and unsurprisingly, after the Business Combination, as investors became aware of the pertinent issues plaguing the Company, the Company's stock price took a nosedive. In truth, the only way that Spartan shareholders' shares would have been worth $10 was if they redeemed their shares and did not take part in the Business Combination. Before accounting for redemptions, Spartan stock had approximately $7.58 per share in value.

216. The Merger Proxy Statement also described certain Spartan related party transactions concerning the Founder Shares and Private Placement Warrants, stating the following, in relevant part:

**Founder Shares**

In August 2020, we issued an aggregate of 11,500,000 Founder Shares to our Sponsor in exchange for the payment of $25,000 of expenses on our behalf, or approximately $0.002 per share. In October 2020, our Sponsor transferred 50,000 Founder Shares to each of our two independent director nominees at their original purchase price. In November 2020, our Sponsor returned to us at no cost an aggregate of 4,312,500 Founder Shares, which we cancelled. In November 2020, we effected a stock dividend on our Founder Shares, which was waived by the our independent director nominees, and resulted in our Sponsor owning 8,525,000 Founder Shares. All shares and associated amounts had been retroactively restated to reflect the share surrender and the stock dividend. of the 8,625,000 Founder Shares outstanding, up to 1,125,000 shares were subject to forfeiture to the extent that the IPO over-allotment option was not exercised by the underwriters, so that the Founder Shares would represent 20.0% of the Spartan's issued and outstanding shares after the IPO. On November 30, 2020, the underwriters fully exercised the over-allotment option; thus, these 1,125,000 shares were no longer subject to forfeiture.

The shares of our Class B Common Stock that we issued prior to our IPO will automatically convert into shares of our Class A Common Stock upon consummation of the Business Combination on a one-for-one basis. In connection with the execution of the Business Combination Agreement, but effective as of the Closing, pursuant to the Founder Stock Agreement, our Sponsor agreed to surrender up to 25% of the Class B Common Stock held by the Sponsor (at a 1:4 ratio to the percentage, if any, of redemptions by holders of Class A Common Stock); provided that no such surrender shall occur unless more than 5% of the

outstanding shares of Class A Common Stock are actually redeemed by Spartan. In addition, pursuant to the Founder Stock Agreement, our Sponsor and each of Jan C. Wilson and John M. Stice, our independent directors, agreed to irrevocably waive any and all rights each such party has or will have with respect to the adjustment to the initial conversion as set forth in the Charter, effective immediately prior to the Closing.

**Private Placement Warrants**

Our Sponsor purchased an aggregate 9,900,000 private placement warrants for a purchase price of $1.00 per warrant in private placements that occurred simultaneously with the closing of our IPO and the sale of the over-allotment options. As such, our Sponsor's interest in this transaction is valued at approximately $9.9 million. Each private placement warrant entitles the holder to purchase one share of our Class A Common Stock at $11.50 per share. The private placement warrants (including the Class A Common Stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder until 30 days after the completion of our Initial Business Combination.

217.    The statements referenced in ¶¶ 216 above were materially false and misleading because Spartan failed to disclose that the entire Spartan Board had deep financial ties to the Founder Shares. Even Defendants Stice and Wilson, whom Spartan represented to be independent directors, each held 50,000 Founder Shares, which would net each of them $500,000 if the Business Combination was successfully effectuated before Spartan's deadline. Because Spartan's Board consisted entirely of directors who had conflicts of interest relating to the Founder Shares, Spartan's Board could not form a special committee consisting of truly disinterested and independent directors.

218.    The Merger Proxy Statement explicitly maintained that Spartan's Board unanimously supported the Business Combination and found that the transactions solicited in the Merger Proxy Statement were "advisable to and in the best interests" of Spartan and its stockholders. The Spartan Board unabashedly recommended that shareholders approve the transactions contemplated in the Merger Proxy Statement.

219.     The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2021 Proposals who could not have approved the 2021 Proposals had they been informed about the Overpayment Misconduct.

220.     Due to the false and misleading elements of the Merger Proxy Statement, Company shareholders voted to: (i) approve the Business Combination; (ii) elect Defendants Bernstein, Gorgas, Henry, Huynh, Nordquist, Potere, Ryan, Shea, and Siegel to Sunlight's Board, allowing them to breach their fiduciary duties to the Company; (iii) approve the NYSE Proposal; and (iv) approve the Plan, thus allowing various of the Individual Defendants to materially benefit from the false and misleading statements contained in the Merger Proxy Statement.

221.     Given the lack of appropriate and accurate disclosures in the Merger Proxy Statement, Spartan shareholders were unable to evaluate what they would receive in connection with any investment in the post-Business Combination Company. As many would come to know, those that failed to redeem their shares were duped into investing in a Company with little to no value.

**July 30, 2021 Registration Statement**

222.     On July 30, 2021, the Company filed a registration statement on Form S-1 (the "Second Registration Statement") with the SEC, which was signed by Defendants Potere and Edinburg. Regarding the Company's contractor advance program, the Second Registration Statement stated the following, in relevant part:

> Upon the engagement of a contractor into Sunlight's network, **Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation**, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. **Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are

categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.

*****

***Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition*** (to support construction processes and provide post construction warranty support) ***and legal compliance practices of the contractors in Sunlight's network.***

(Emphasis added.)

223. The statements in ¶ 222 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

***September 2, 2021 Amendment***

224. On September 2, 2021, the Company filed an amendment to the Second Registration Statement with the SEC, which was signed by Defendants Potere and Edinburg. Regarding the Company's contractor advance program, the amendment to the Second Registration Statement stated the following, in relevant part:

Upon the engagement of a contractor into Sunlight's network, ***Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation***, workmanship warranty offered to its customers and other legal documentation and sales tools used by the

contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.

*** 

***Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition*** (to support construction processes and provide post construction warranty support) ***and legal compliance practices of the contractors in Sunlight's network.***

(Emphasis added.)

225.    The statements in ¶ 224 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

### September 7, 2021 Prospectus

226.    On September 7, 2021, the Company filed a prospectus with the SEC which forms part of the Second Registration Statement (the "Prospectus"). Regarding the Company's contractor advance program, the Prospectus stated the following, in relevant part:

Upon the engagement of a contractor into Sunlight's network, ***Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and***

*performs a review of the contractor's reputation*, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.

***

***Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition*** (to support construction processes and provide post construction warranty support) ***and legal compliance practices of the contractors in Sunlight's network.***

(Emphasis added.)

227.     The statements in ¶ 226 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

### April 22, 2022 Prospectus

228.     On April 22, 2022, the Company filed a prospectus with the SEC which forms part of the Second Registration Statement (the "Second Prospectus"). Regarding the Company's contractor advance program, the Second Prospectus stated the following, in relevant part:

Upon the engagement of a contractor into Sunlight's network, ***Sunlight diligences credit bureau data and the contractor's financial and liquidity position, and performs a review of the contractor's reputation***, workmanship warranty offered to its customers and other legal documentation and sales tools used by the contractor. ***Once onboarded, Sunlight continues to monitor the contractors in its network against these same standards at least annually and, if advisable, more frequently*** . . . Based on Sunlight's diligence findings, Sunlight either accepts or declines to include a contractor in its network. Contractors that are accepted are categorized into risk tiers that can drive the periodicity of monitoring, the amount of the original issue discounts, or fees, charged to such contractors by Sunlight and, for solar system contractors, the availability of advances and the amount of any advances, if eligible, as well as other key business terms applicable to the contractor's relationship with Sunlight.

***

***Sunlight has established a robust commercial underwriting and ongoing monitoring process to assure that the quality of the work product, solar system construction, financial condition*** (to support construction processes and provide post construction warranty support) ***and legal compliance practices of the contractors in Sunlight's network.***

(Emphasis added.)

229.    The statements in ¶ 228 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

**The Truth Emerges Regarding the Advance Program**

230.    On September 28, 2022, after the close of trading, the Company filed a Form 8-K with the SEC which revealed that Sunlight was going to take a "non-cash advance receivables

impairment charge of $30 million to $33 million during the Company's fiscal quarter ending September 30, 2022." In the 8-K, Sunlight explained that the Company "was informed of certain actions taken by one of its installer partners to address liquidity issues faced by the installer" which "would likely result in the inability of the Company to collect on advances outstanding to such installer." Attached to the 8-K was a press release in which Defendant Potere revealed that Sunlight would be "re-underwriting all contractor partners' advances to further mitigate risk going forward."

231. Regarding the material impairment, the 8-K revealed the following:

Sunlight Financial Holdings Inc. (the "Company" or "Sunlight") records financing receivables for advances that Sunlight remits to contractors to facilitate the installation of residential solar systems to provide such contractors with up-front working capital to pay for certain expenses in connection with the installation or the construction of solar systems and home improvements. ***In September 2022, the Company was informed of certain actions taken by one of its installer partners to address liquidity issues faced by the installer. As a result of this information and the Company's analysis that these actions would likely result in an inability of the Company to collect on advances outstanding to such installer, the Company determined on September 23, 2022 that it was appropriate to impair its advance receivables.*** The Audit Committee of the Board of Directors of the Company reviewed the Company's determination and ***the Company concluded to take a non-cash advance receivables impairment charge of $30 million to $33 million during the Company's fiscal quarter ending September 30, 2022.*** Although the Company does not anticipate that the impairment charges will result in future cash expenditures as the impairment is a non-cash charge, the Company expects to incur certain non-recurring expenses in connection with its facilitation of solar loans where installation may not have been fully completed.

(Emphasis added.)

232. On this news, Sunlight's stock price fell $1.44 per share, or 57.1%, from a closing of $2.52 per share on September 28, 2022 to close at $1.08 per share on September 29, 2022.

## Repurchases During the Relevant Period

233. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the

Company spent an aggregate amount of over $25.2 million to repurchase approximately 4,631,947 shares of its own common stock at artificially inflated prices from January 2021 through September 2022.

234. According to the 3Q 2021 10-Q, between July 1, 2021 and July 31, 2021, the Company purchased 1,535,941 shares of its common stock for approximately $14,530,002 at an average price of $9.46 per share.

235. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $12,871,186 for repurchases of its own stock between July 1, 2021 and July 31, 2021.

236. According to the 3Q 2021 10-Q, between August 1, 2021 and August 31, 2021, the Company purchased 10,644 shares of its common stock for approximately $58,010 at an average price of $5.45 per share.

237. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $46,514 for repurchases of its own stock between August 1, 2021 and August 31, 2021.

238. According to the 3Q 2021 10-Q, between September 1, 2021 and September 30, 2021, the Company purchased 5,822 shares of its common stock for approximately $30,915 at an average price of $5.31 per share.

239. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $24,627 for repurchases of its own stock between September 1, 2021 and September 30, 2021.

240. According to the 2021 10-K, between October 1, 2021 and October 31, 2021, the Company purchased 5,892 shares of its common stock for approximately $34,822 at an average price of $5.91 per share.

241. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $28,459 for repurchases of its own stock between October 1, 2021 and October 31, 2021.

242. According to the 2021 10-K, between November 1, 2021 and November 30, 2021, the Company purchased 5,710 shares of its common stock for approximately $24,953 at an average price of $4.37 per share.

243. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $18,786 for repurchases of its own stock between November 1, 2021 and November 30, 2021.

244. According to the 2021 10-K, between December 1, 2021 and December 31, 2021, the Company purchased 5,900 shares of its common stock for approximately $28,202 at an average price of $4.78 per share.

245. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $21,830 for repurchases of its own stock between December 1, 2021 and December 31, 2021.

246. According to the 1Q 2022 10-Q, between January 1, 2022 and January 31, 2022, the Company purchased 4,960 shares of its common stock for approximately $14,582 at an average price of $2.94 per share.

247. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $9,226 for repurchases of its own stock between January 1, 2022 and January 31, 2022.

248. According to the 1Q 2022 10-Q, between February 1, 2022 and February 28, 2022, the Company purchased 4,251 shares of its common stock for approximately $17,302 at an average price of $4.07 per share.

249. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $12,711 for repurchases of its own stock between February 1, 2022 and February 28, 2022.

250. According to the 1Q 2022 10-Q, between March 1, 2022 and March 31, 2022, the Company purchased 4,312 shares of its common stock for approximately $21,733 at an average price of $5.04 per share.

251. As the Company's stock was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $17,076 for repurchases of its own stock between March 1, 2022 and March 31, 2022.

252. According to the 2Q 2022 10-Q, between May 1, 2022 and May 31, 2022, the Company purchased 222,700 shares of its common stock for approximately $999,923 at an average price of $4.49 per share.

253. As the Company's stock price was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $759,407 for repurchases of its own stock between May 1, 2022 and May 31, 2022.

254. According to the 2Q 2022 10-Q, between June 1, 2022 and June 30, 2022, the Company purchased 222,532 shares of its common stock for approximately $1,003,619 at an average price of $4.51 per share.

255. As the Company's stock price was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $763,285 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

256. According to the Form 10-Q the Company filed with the SEC on November 14, 2022 for the quarterly period ended September 30, 2022 (the "3Q 2022 10-Q"), between July 1, 2022 and July 31, 2022, the Company purchased 732,831 shares of its common stock for approximately $2,389,029 at an average price of $3.26 per share.

257. As the Company's stock price was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $1,597,572 for repurchases of its own stock between July 1, 2022 and July 31, 2022.

258. According to the 3Q 2022 10-Q, between August 1, 2022 and August 31, 2022, the Company purchased 1,160,259 shares of its common stock for approximately $4,002,894 at an average price of $3.45 per share.

259. As the Company's stock price was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $2,749,814 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

260. According to the 3Q 2022 10-Q, between September 1, 2022 and September 30, 2022, the Company purchased 710,193 shares of its common stock for approximately $2,087,967 at an average price of $2.94 per share.[5]

---

[5] Upon information and belief, these shares were repurchased during the Relevant Period.

261.     As the Company's stock price was actually worth only $1.08 per share, the price at closing on September 29, 2022, the Company overpaid by approximately $1,320,959 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

262.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $20.2 million.

## DAMAGES TO SUNLIGHT

263.     As a direct and proximate result of the Individual Defendants' conduct, Sunlight has lost and will continue to lose and expend many millions of dollars.

264.     Such losses include over $20.2 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

265.     Such losses also include legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto and in connection to the Overpayment Misconduct.

266.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including amounts paid by the Company pursuant to the Plan which was approved by shareholders based on the materially false and misleading Merger Proxy Statement.

267.     As a direct and proximate result of the Individual Defendants' conduct, Sunlight has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

268.    Plaintiff brings this action derivatively and for the benefit of Sunlight to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sunlight, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

269.    Sunlight is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

270.    Plaintiff is, and has been at all relevant times, a shareholder of Sunlight. Plaintiff will adequately and fairly represent the interests of Sunlight in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

271.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

272.    A pre-suit demand on the Board of Sunlight is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Potere, Bernstein, Gorgas, Henry, Huynh, Nordquist, Ryan, Shea, and Siegel (the "Director Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director Defendants who are on the Board at the time of the filing of this complaint.

273. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Overpayment Misconduct, to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by nearly $20.2 million for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

274. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to engage in the Overpayment Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

275. Additional reasons that demand on Defendant Potere is futile follow. Defendant Potere is the Company's CEO and has served as a Company director since the Business Combination. He previously served as the CEO and as a member of the board of directors for Legacy Sunlight from 2015 until the consummation of the Business Combination. As Legacy Sunlight's (and following the Business Combination, the Company's) CEO, Defendant Potere was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he signed in

the Second Registration Statement and the amendment to the Second Registration Statement. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Potere with his principal occupation for which he receives handsome compensation. As the Company's highest officer, Defendant Potere conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Potere is a defendant in the Securities Class Actions. For these reasons, Defendant Potere breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

276. Additional reasons that demand on Defendant Bernstein is futile follow. Defendant Bernstein has served as a Company director since the Business Combination. Prior to this, he served as a director of Legacy Sunlight from 2015 until the Business Combination. Defendant Bernstein has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Bernstein is a defendant in the Delaware Class Action. For these reasons, Defendant Bernstein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

277. Additional reasons that demand on Defendant Gorgas is futile follow. Defendant Gorgas has served as a Company director since 2021. She also serves as Chair of the Compensation

Committee. Defendant Gorgas has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Gorgas breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

278. Additional reasons that demand on Defendant Henry is futile follow. Defendant Henry is Chairman of the Board and has served as a Company director since 2021. Prior to this, he served as a director of Legacy Sunlight from 2018 until the Business Combination. Defendant Henry has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Henry is also a defendant in the Delaware Class Action. For these reasons, Defendant Henry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

279. Additional reasons that demand on Defendant Huynh is futile follow. Defendant Huynh has served as a Company director since 2021. She also serves as Chair of the Nominating, Governance & ESG Committee and as a member of the Audit Committee. Defendant Huynh has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the

Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Huynh breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

280. Additional reasons that demand on Defendant Nordquist is futile follow. Defendant Nordquist has served as a Company director since 2021. She also serves as a member of the Compensation Committee and as a member of the Nominating, Governance & ESG Committee. Defendant Nordquist has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Nordquist breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

281. Additional reasons that demand on Defendant Ryan is futile follow. Defendant Ryan has served as a Company director since 2021. He also serves as Chair of the Audit Committee. Defendant Ryan has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ryan

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

282.     Additional reasons that demand on Defendant Shea is futile follow. Defendant Shea has served as a Company director since 2021. He also serves as a member of the Compensation Committee. Defendant Shea has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Shea breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

283.     Additional reasons that demand on Defendant Siegel is futile follow. Defendant Siegel has served as a Company director since 2021. He also serves as a member of the Audit Committee and as a member of the Nominating, Governance & ESG Committee. Defendant Siegel has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Siegel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

284.     Additional reasons that demand on the Board is futile follow.

285.    Defendants Gorgas, Huynh, Nordquist, Ryan, Shea, and Siegel received payments under the Plan as a result of the Spartan Defendants' solicitation of the Merger Proxy Statement which called for shareholder approval of the Plan. Shareholders would not have approved the Plan had they known the true state of affairs at the Company or at Legacy Sunlight. As a result of shareholder approval of the Plan, Defendants Gorgas, Huynh, Nordquist, Ryan, Shea and Siegel each received $118,250 worth of stock awards during Fiscal Year 2021 and $125,000 worth of stock awards during Fiscal Year 2022 from the Company pursuant to the Plan. As a result, Defendants Gorgas, Huynh, Nordquist, Ryan, Shea, and Siegel are beholden to the Spartan Defendants and, thus, cannot be presumed to be disinterested in taking action against them. As such, demand upon Defendants Gorgas, Huynh, Nordquist, Ryan, Shea, and Siegel is futile and, therefore, excused.

286.    Each of the Director Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

287.    Moreover, Defendants Huynh, Ryan, and Siegel served as members of the Audit Committee during the Relevant Period. In violation of the Charter, Defendants Huynh, Ryan, and Siegel failed to adequately exercise their risk management and risk assessment functions and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Huynh, Ryan, and

Siegel further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

288.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

289.    Sunlight has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Sunlight any part of the damages Sunlight suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

290.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability,

they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

291.    The acts complained of herein constitute violations of fiduciary duties owed by Sunlight's officers and directors, and these acts are incapable of ratification.

292.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sunlight. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Sunlight, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

293.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Sunlight to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

294.     Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

295.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

296.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

297.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

298.     Under the direction and watch of the Spartan Defendants, the Merger Proxy Statement failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked

effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

299.     Moreover, the Merger Proxy Statement failed to disclose that the Board's oversight and risk mechanisms were not adequate given the aforementioned misconduct and that the Code of Conduct was not complied with. The Merger Proxy Statement also failed to disclose that Spartan had failed to conduct proper due diligence of Legacy Sunlight's operations leading up to the Business Combination.

300.     The Spartan Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination in the Merger Proxy Statement, including but not limited to, the election of directors and approval of the Plan, which provided (and provides) material benefits to them and certain of the other Individual Defendants.

301.     Moreover, under the Plan, Defendants Gorgas, Huynh, Nordquist, Ryan, Shea and Siegel each received $118,250 worth of stock awards during Fiscal Year 2021 and $125,000 worth of stock awards during Fiscal Year 2022 from the Company.

302.     The Company was damaged as a result of the Spartan Defendants' material misrepresentations and omissions in the Merger Proxy Statement.

303.     Plaintiff on behalf of Sunlight has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of**

**Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

304.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

305.    The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding Sunlight. Not only is Sunlight now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Sunlight by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging Sunlight.

306.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

307.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Sunlight not misleading.

308.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and

did control the conduct complained of herein and the content of the public statements disseminated by Sunlight.

309.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

310.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

311.     Plaintiff on behalf of Sunlight has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a)
of the Securities Exchange Act of 1934**

312.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

313.     The Individual Defendants, by virtue of their positions with Sunlight and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Sunlight and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Sunlight to engage in the illegal conduct and practices complained of herein.

314.     Plaintiff on behalf of Sunlight has no adequate remedy at law.

# FOURTH CLAIM

## Against the Individual Defendants for Breach of Fiduciary Duties

315.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

316.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sunlight's business and affairs.

317.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

318.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sunlight.

319.    In breach of their fiduciary duties owed to Sunlight, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the contractor advance program posed a significant risk to Sunlight; (2) the Company failed to have the stringent monitoring and vetting systems necessary to timely detect bad debt associated with its contractor advance program; (3) Sunlight lacked effective internal controls over accounting and reporting of non-cash receivables; and (4) as a result, Sunlight would be forced to take a non-cash advance receivables impairment charge exceeding $30 million. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

320.    In breach of their fiduciary duties owed to Sunlight, the Individual Defendants also willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the entire solar industry was facing severe

supply chain issues, labor delays, and shortages; (2) due to these widespread issues, the costs of the materials needed to build solar panels were rapidly increasing; and (3) as a result, the Company had experienced a "margin decrease" that was harming the Company. As a result of the foregoing, Sunlight's public statements were materially false and misleading at all relevant times.

321. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

322. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

323. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

324. Moreover, Defendants Potere, Bernstein, and Henry breached their fiduciary duties to the Company, or aided and abetted in such breaches, by engaging in and/or facilitating the Overpayment Misconduct.

325. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

326. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was

engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sunlight's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

327. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

328. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sunlight has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

329. Plaintiff on behalf of Sunlight has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants and the Sponsor for Unjust Enrichment**

330. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

331. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and the Sponsor were unjustly enriched at the expense of, and to the detriment of, Sunlight.

332. The Individual Defendants and the Sponsor either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sunlight that was tied to the performance or artificially inflated valuation of Sunlight, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This

includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. This also includes compensation received under the Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations, and the millions of dollars that certain Defendants cashed out in connection with the close of the Business Combination.

333. Plaintiff, as a shareholder and representative of Sunlight, seeks restitution from the Individual Defendants and the Sponsor and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants under the Plan, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and the Sponsor due to their wrongful conduct and breach of their fiduciary duties.

334. Plaintiff on behalf of Sunlight has no adequate remedy at law.

<u>**SIXTH CLAIM**</u>

**Against Individual Defendants for Abuse of Control**

335. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

336. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sunlight, for which they are legally responsible.

337. As a direct and proximate result of the Individual Defendants' abuse of control, Sunlight has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Sunlight has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

338. Plaintiff on behalf of Sunlight has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants and the Sponsor or Gross Mismanagement

339.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

340.     By their actions alleged herein, Defendants Strong, Potere, Crossen, Edinburg, Wassenaar, Handler, Hommes, Romeo, and Yoder and the Sponsor, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sunlight in a manner consistent with the operations of a publicly-held corporation.

341.     As a direct and proximate result of these Defendants' gross mismanagement and breaches of duty alleged herein, Sunlight has sustained and will continue to sustain significant damages.

342.     As a result of the misconduct and breaches of duty alleged herein, these Defendants are liable to the Company.

343.     Plaintiff on behalf of Sunlight has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants and the Sponsor for Waste of Corporate Assets

344.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

345.     The Individual Defendants and the Sponsor caused the Company to pay the Individual Defendants and the Sponsor excessive salaries and fees, to the detriment of the shareholders and the Company.

346. The Spartan Defendants caused the Company to engage in the Overpayment Misconduct, to the detriment of the Spartan's shareholders and the Company. As noted below, certain of the Defendants further aided and abetted this misconduct.

347. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants and the Sponsor have caused the Company to waste valuable corporate assets, including by, *inter alia*, by acquiring Legacy Sunlight on terms unfavorable to Spartan shareholders, while Legacy Sunlight suffered from undisclosed issues and material risks. The Individual Defendants' and the Sponsor's misconduct has caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

348. In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

349. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

350. Plaintiff on behalf of Sunlight has no adequate remedy at law.

## NINTH CLAIM

**Against Defendants Strong, Potere, Crossen, Edinburg, Wassenaar, Handler, Hommes, Romeo, and Yoder and the Sponsor for Contribution Under Sections 10(b) and 21D of the Exchange Act**

351. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

352. Sunlight and Defendants Strong, Potere, Crossen, Edinburg, Wassenaar, Handler, Hommes, Romeo, and Yoder and the Sponsor are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Strong's, Potere's, Crossen's, Edinburg's, Wassenaar's, Handler's, Hommes's, Romeo's, and Yoder's and the Sponsor's willful and/or reckless violations of their obligations as officers and/or directors of Sunlight.

353. Defendants Strong, Potere, Crossen, Edinburg, Wassenaar, Handler, Hommes, Romeo, and Yoder and the Sponsor, because of their positions of control and authority as officers and/or directors of the Company and/or Legacy Sunlight, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Sunlight, including the wrongful acts complained of herein and in the Securities Class Action.

354. Accordingly, Defendants Strong, Potere, Crossen, Edinburg, Wassenaar, Handler, Hommes, Romeo, and Yoder and the Sponsor are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

355. As such, Sunlight is entitled to receive all appropriate contribution or indemnification from Defendants Strong, Potere, Crossen, Edinburg, Wassenaar, Handler, Hommes, Romeo, and Yoder and the Sponsor.

## **TENTH CLAIM**

**Against The Legacy Sunlight Defendants for Aiding and Abetting Breach of Fiduciary**

**Duty**

356.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

357.    The Legacy Sunlight Defendants aided and abetted the Spartan Defendants who breached their fiduciary duties to the Company.

358.    The Legacy Sunlight Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

359.    Specifically, these Individual Defendants promoted the Business Combination by issuing and/or consenting to the issuance of false and misleading statements concerning Legacy Sunlight's products, operations, and business prospects. Moreover, the Legacy Sunlight Defendants controlled and operated Legacy Sunlight, the Company's operational predecessor, and directly made statements and/or caused Legacy Sunlight to jointly issue press releases and SEC filings which contained materially false and misleading statements promoting the Company's future operations and prospects.

360.    The Legacy Sunlight Defendants are jointly and severally liable to the same extent as the Spartan Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

361.    As a direct and proximate result of the Legacy Sunlight Defendants' aiding and abetting of the Spartan Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

362.    Plaintiff on behalf of Sunlight has no adequate remedy at law.

## <u>PRAYER FOR RELIEF</u>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Sunlight, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Sunlight;

(c)     Determining and awarding to Sunlight the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Sunlight and the Individual Defendants to take all necessary actions to reform and improve Sunlight's corporate governance and internal procedures to comply with applicable laws and to protect Sunlight and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Sunlight to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Sunlight restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 18, 2023                    Respectfully submitted,

**HAUSLER LAW FIRM, PLLC**

*/s/ Kurt F. Hausler*
Kurt F. Hausler
NC Bar No. 22103
524 East Boulevard
Charlotte, NC 28203
Telephone: (704) 247-3255
Facsimile: (704) 247-3267
Email: khausler@hauslerlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
          eitank@bgandg.com

*Counsel for Plaintiff*

DocuSign Envelope ID: 3FBAFA1E-8D12-40DA-83B2-54D5ED2A0556

## **VERIFICATION**

I, Denish Bhavsar, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this
17
___ day of August, 2023.

_____
Denish Bhavsar